## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DONALD R. ZIMMERMAN, SR.,** | |
| **Plaintiff,** | |
| **v.** | **Consol. Case No. 1:22-CV-01192-JCG** |
| **INTERNATIONAL LONGSHOREMAN'S ASSOCIATION LOCAL 1694, WILLIAM ASHE, GT WILMINGTON, LLC, AND JERRY CUSTIS,** | |
| **Defendants.** | |

### OPINION AND ORDER

Before the Court is Plaintiff's Motion for Preliminary Injunction ("Plaintiff's Motion" or "Pl.'s Mot.") filed by Plaintiff Donald R. Zimmerman, Sr., ("Plaintiff").  C.A. No. 22-01441, Pl.'s Mot. Prelim. Injunction (D.I. 6); <u>see</u> C.A. No. 22-01441, Pl.'s Mem. Supp. Mot. Prelim. Injunction ("Pl.'s Br.") (D.I. 7). Defendants GT Wilmington, LLC, and Jerry Custis ("Custis") (collectively, "GT Wilmington") filed a response to Plaintiff's Motion.  C.A. No. 22-01441, Defs.' Resp. Mem. Opp'n Pl.'s Mot. Prelim. Injunction ("GT Wilmington's Resp.") (D.I. 13).  Also before the Court are three motions to dismiss filed by GT Wilmington and Defendants International Longshoremen's Association Local 1694 ("Local

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 2 of 70 PageID #: 172

Consol. C.A. No. 22-01192                                            Page 2

1694") and William Ashe ("Ashe") (collectively, "Union Defendants").  Consol. C.A. No. 22-01192, Defs.' Mot. Dismiss (D.I. 12); C.A. No. 23-00968, Defs.' Mot. Dismiss (D.I. 6); C.A. No. 22-01441, Defs.' Mot. Dismiss Am. Compl. Pursuant R. 12(b)(6) Fed. R. Civ. P. In Lieu Answer ("GT Wilmington's Mot. Dismiss") (D.I. 14); see also Consol. C.A. No. 22-01192, Defs.' Opening Br. Supp. Mot. Dismiss ("Union Defs.' Br.") (D.I. 13); C.A. No. 23-00968, Defs.' Opening Br. Supp. Mot. Dismiss ("Union Defs.' Br.") (D.I. 7).  Plaintiff filed responses to the motions. Consol. C.A. No 22-01192, Pl.'s Answering Br. Opp'n Defs.' Mot. Dismiss ("Pl.'s Resp.") (D.I. 15); C.A. No. 23-00968, Pl.'s Answering Br. Opp'n Defs.' Mot. Dismiss ("Pl.'s Resp.") (D.I. 11); C.A. No. 22-01441, Pl.'s Resp. Defs.' Mot. Dismiss Am. Compl. Pursuant R. 12(b)(6) Fed. R. Civ. P. ("Pl.'s Resp.") (D.I. 18). The Union Defendants filed replies to Plaintiff's responses.  Consol. C.A. No. 22-01192, Defs.' Reply Pl.'s Answering Br. Resp. Defs.' Mot. Dismiss (D.I. 19); Consol. C.A. No. 22-01192, Defs.' Reply Br. Supp. Mot. Dismiss (D.I. 26).

For the reasons discussed below, the Court grants in part and denies in part Plaintiff's Motion for Preliminary Injunction, grants in part and denies in part GT Wilmington's Motion to Dismiss Plaintiff's Amended Complaint in Civil Action No. 22-01441, denies the Union Defendants' Motion to Dismiss Plaintiff's Amended Complaint in Consolidated Civil Action No. 22-01192, and denies the

Union Defendants' Motion to Dismiss Plaintiff's Complaint in Civil Action No.
23-00968.

## BACKGROUND

### I.        Employment with GT Wilmington

The following are facts alleged by Plaintiff in the Amended Complaint in
Civil Action No. 22-01441:

Between May 1986 and November 17, 2020, Plaintiff worked at the Port of
Wilmington ("Port") as an employee of GT Wilmington and its predecessor,
Diamond State Port Corporation.  C.A. No. 22-01441, Am. Compl. ¶ 3.  Plaintiff
worked initially as a forklift operator and then later as a crane operator.  Id. ¶ 7.  In
2019, GT Wilmington created a cost-free gasoline benefit that allowed authorized
employees to receive a daily maximum of five gallons of gasoline for free.  Id.
¶ 12.  Although union-represented employees who used their personal vehicles for
work-related purposes were considered authorized individuals for purposes of the
cost-free gasoline benefit, GT Wilmington never provided operators of the gasoline
pump ("gear men") with a list of the names of individuals who were actually
authorized.  Id.  Other than a handwritten cardboard sign indicating the five-gallon
daily limit, GT Wilmington did not provide rules governing how authorized
individuals could obtain gas.  Id. ¶ 14.  Employees would usually pull up to the gas
pump and the gear man on duty would ask them to confirm whether they were

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 4 of 70 PageID #: 174

Consol. C.A. No. 22-01192                                          Page 4

authorized to receive free gas and the amount they were authorized to receive.  Id. ¶ 13.  Some employees would also pump more than the five-gallon maximum on a particular day to compensate for the days they had missed.  Id. ¶ 14.

On November 10, 2020, Plaintiff and a coworker were assigned as gear men when Tim Miller ("Miller"), who was also qualified as a gear man, pulled up in his personal vehicle, activated the pump, and began fueling the vehicle.  Id. ¶ 16. When Plaintiff asked Miller if he was authorized to receive fuel, Miller responded affirmatively and Plaintiff, in accordance with common practice at the Port, took Miller at his word.  Id. ¶ 17.  The coworker who was working alongside Plaintiff as a gear man that day reported to management that Miller had stolen gasoline.  Id. Plaintiff's coworker did not inculpate Plaintiff in the report.  Id.  On November 11, 2020, Plaintiff was summoned by GT Wilmington's warehouse manager, who explained that management was conducting a gas audit.  Id. ¶ 18.  Plaintiff requested that a union representative be present at the meeting, but his request was denied, and Plaintiff was assured that he was not a target of discipline.  Id.  When the warehouse manager asked Plaintiff if he had ever given fuel to an unauthorized individual, Plaintiff responded that, to his knowledge, he had not.  Id. ¶ 19. Plaintiff also explained that he did not have a list he could use to determine an individual's authorization status because there were hundreds of employees working at the Port on a typical day who claimed to be authorized to receive fuel.

Id.

GT Wilmington suspended Plaintiff during the pendency of the investigation, fired him on November 17, 2020 on the basis that Plaintiff "knowingly allow[ed] the unauthorized distribution of fuel" to Miller who was not entitled to receive fuel, and permanently banned Plaintiff from entering the Port. Id. ¶¶ 20–21.  GT Wilmington also filed for a "no contact" order ("No Contact Order") with the Justice of the Peace Court 20 in New Castle County ("New Castle County Court"), which was granted and ordered Plaintiff to "have no contact, direct or indirect with [the] Port of Wilmington."  Id. ¶ 31; see Pl.'s Br. at Ex. E, (D.I. 7-3).  On December 7, 2020, GT Wilmington abandoned its claim that Plaintiff's employment was terminated because he acted intentionally, and GT Wilmington claimed instead that Plaintiff's discharge was justified because Plaintiff negligently allowed Miller to pump gas and negligently failed to notify management of the alleged theft.  C.A. No. 22-01441, Am. Compl. ¶ 23.  On December 22, 2020, Custis, who was GT Wilmington's Head of Security, reported to the Wilmington Police Department that Plaintiff had conspired with Miller and stolen gasoline.  Id. ¶¶ 5, 31; see Pl.'s Br. at Ex. C.  On the same day, the Wilmington Police Department obtained a warrant for Plaintiff's arrest on charges of theft under $1500 and conspiracy in the third degree (agreeing to aid another in a misdemeanor).  C.A. No. 22-01441, Am. Compl. ¶ 31; see Pl.'s Br. at Ex. C (D.I.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 6 of 70 PageID #: 176

Consol. C.A. No. 22-01192                                                    Page 6

7-2).  Plaintiff learned of the outstanding arrest warrant on January 2, 2021 and

turned himself in at a Wilmington police station on January 5, 2021.  C.A. No. 22-

01441, Am. Compl. ¶ 32.  Plaintiff requested a modification of the No Contact

Order, which the New Castle County Court granted, allowing Plaintiff to return to

his place of employment at the Port of Wilmington.  See id. ¶ 33; see also Pl.'s Br.

at Ex. F (D.I. 7-3).  Notwithstanding the modification of the No Contact Order, GT

Wilmington's security guards continued to deny Plaintiff access to the Port on a

permanent basis.  C.A. No. 22-01441, Am. Compl. ¶ 33.  The theft and conspiracy

to commit theft charges were dismissed by the prosecutor through *nolle prosequi*

on April 19, 2021 due to a lack of evidence.  Id. ¶¶ 34, 51; see Pl.'s Br. at Ex. D

(D.I. 7-2).

## II.    Representation by Local 1694

The following are facts alleged by Plaintiff in the Amended Complaint in

Consolidated Civil Action No. 22-01192:

For purposes of collective bargaining, Plaintiff was represented by

International Longshoreman's Association ("ILA"), Local 1694-1 ("Local 1694-

1").  Consol. C.A. No. 22-01192, Am. Compl. ¶ 3.  On November 18, 2020, Local

1694-1 filed a grievance on behalf of Plaintiff challenging GT Wilmington's

termination of Plaintiff's employment.  Id.  The grievance reached the settlement

step of the contractual grievance procedure, but no settlement was reached.  Id. ¶

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 7 of 70 PageID #: 177

Consol. C.A. No. 22-01192                                                    Page 7

23.  The Executive Board of Local 1694-1 voted unanimously for the grievance to be taken to arbitration.  Id. ¶ 24.  An arbitration under the administration of the American Arbitration Association was scheduled for May 17, 2021.  Id.

   In January 2021, Plaintiff paid his union dues to Local 1694-1 for the 2021 calendar year.  Id. ¶ 7.  On March 11, 2021, approximately two months before the arbitration hearing, Local 1694-1 was dissolved and its members were absorbed by three ILA locals, Locals 1694, 1883, and 1884, based on their job classifications. Id. ¶ 8; see C.A. No. 22-01441, Am. Compl. ¶ 26.  Plaintiff was accepted as a member of Local 1694 because he was a crane operator.  Consol. C.A. No. 22-01192, Am. Compl. ¶¶ 8–10.  The terms regarding the merger of the unions ("Merger Agreement") provided that members of Local 1694-1 who were in good standing as of the date of the merger would become members of Local 1694 in good standing.  Id. ¶ 8.  The Merger Agreement also provided that dues obligations of former members of Local 1694-1 would be payable to Local 1694 and that, "for all purposes of the bylaws" of Local 1694, the terms "good standing" or "continuous good standing in the local" would include members of Local 1694-1 who were in good standing prior to the merger.  Id.  Local 1694 also agreed to honor existing contractual arrangements and to assume all collective bargaining duties and responsibilities undertaken by Local 1694-1 before the merger.  Id. ¶ 25. Article IV of Local 1694's bylaws provides that individuals employed in, or

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 8 of 70 PageID #: 178

Consol. C.A. No. 22-01192                                                      Page 8

seeking employment in, a craft or trade within Local 1694's jurisdiction may

qualify for membership and that members may be expelled for non-payment of

dues or "after appropriate proceedings consistent with the International

Constitution" but not otherwise.  Id. ¶¶ 16–17.

In March 2021, Local 1694 withdrew Plaintiff's grievance from arbitration.

Id. ¶ 26.  On August 24, 2021, Plaintiff requested a membership vote in accordance

with Article VII(b) of Local 1694's bylaws regarding Local 1694's decision to

remove his grievance from arbitration.  Id. ¶ 27.  Ashe, President of Local 1694,

ruled that Plaintiff's request was out of order.  Id.  On August 30, 2021, Plaintiff

petitioned the Executive Board to reconsider its decision to remove Plaintiff's

grievance from arbitration, but Ashe denied the request based on undisclosed

information that allegedly implicated Plaintiff in a theft.  Id. ¶ 28.  Neither Ashe

nor Local 1694 stated that the reason for removing the grievance from arbitration

was that Plaintiff was not eligible to be a member of Local 1694.  Id.

In December 2021 and March 2022, Plaintiff tendered dues to Local 1694,

which were rejected, and Plaintiff was informed by Ashe that Local 1694 rejected

his tender of dues because Plaintiff was no longer employed in a craft or trade

within Local 1694's jurisdiction.  Id. ¶¶ 15, 29–30.  Local 1694 also claimed that

Plaintiff was not eligible for membership because he was permanently banned

Case 1:22-cv-01192-JCG  Document 29  Filed 06/24/24  Page 9 of 70 PageID #: 179

Consol. C.A. No. 22-01192                                                    Page 9

from entering the Port and therefore was unable to seek work within Local 1694's jurisdiction.  Id. ¶ 31.

### III.    Procedural History

Plaintiff filed a complaint against Local 1694 and Ashe on September 9, 2022 and amended it on December 13, 2022, asserting that Local 1694: violated Section 101(a)(5) of the Labor Management Relations Act ("LMRA") (29 U.S.C. § 411(a)(5)) by wrongfully expelling Plaintiff from membership in Local 1694 (Count I); engaged in tortious interference with Plaintiff's prospective economic advantage (Count II); breached the Merger Agreement in violation of 29 U.S.C. § 185 (Count III); breached the Merger Agreement in violation of common law (Count IV); violated Local 1694's bylaws (Count V); and wrongfully denied Plaintiff his free speech rights in violation of 29 U.S.C. § 411(a)(2) (Count VI).  Id. ¶¶ 34–59.  Plaintiff also filed a complaint against the Union Defendants alleging disparate treatment based upon race (Count I) and hostile work environment (Count II).  C.A. No. 23-00968, Compl. ¶¶ 53–68.

Plaintiff filed a complaint against GT Wilmington alleging: discharge without just cause in violation of a collective bargaining agreement (Count I); malicious prosecution (Count II); intentional infliction of emotional distress (Count III); compelled self-defamation (Count IV); race discrimination in violation of 42 U.S.C. § 1981 (Count V); tortious interference with prospective economic

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 10 of 70 PageID #: 180

Consol. C.A. No. 22-01192                                                    Page 10

advantage (Count VI); and Fourth Amendment malicious prosecution (Count VII).
C.A. No. 22-01441, Am. Compl. ¶¶ 36–83.  Civil Action Nos. 23-00968, 22-
01441, and 23-00202 were consolidated into Consolidated Civil Action No. 22-
01192 by order of the Court on December 21, 2023.  Order (D.I. 24).

## LEGAL FRAMEWORK

Federal Rule of Civil Procedure 8(a) requires that pleadings contain a short
and plain statement of the claim showing that the pleader is entitled to relief.  Fed.
R. Civ. P. 8(a)(1).  If pleadings fail to state a claim, in whole or in part, on which a
court may grant relief, a defendant may seek to dismiss a complaint under Federal
Rule of Civil Procedure 12(b)(6).  Fed. R. Civ. P. 12(b)(6).  "To survive a motion
to dismiss, a complaint must contain sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
"A claim has facial plausibility when the plaintiff pleads factual content that allows
the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged."  Id.  Plausibility requires "more than a sheer possibility that a
defendant has acted unlawfully."  Id.  In considering a motion to dismiss, the Court
must assume the factual allegations contained in the complaint to be true and draw
all reasonable inferences in favor of the non-moving party.  Twombly, 550 U.S.
555–56.  However, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to state a claim.  <u>Iqbal</u>,

556 U.S. at 679.

## DISCUSSION

**I.    Motion to Dismiss Plaintiff's Complaint against GT Wilmington
       (C.A. No. 22-01441)**

### A.    Count I: Discharge Without Just Cause in Violation of
###        Collective Bargaining Agreement

Count I of Plaintiff's Amended Complaint against GT Wilmington asserts

that GT Wilmington discharged Plaintiff without just cause because GT

Wilmington failed to: (1) define the rules of conduct that it alleged Plaintiff

violated; (2) prescribe penalties for violations of the alleged standards of conduct;

(3) alert Plaintiff that it would strictly enforce rules that had not been previously

enforced; and (4) investigate the fuel discharge incident in good faith.  C.A. No.

22-01441, Am. Compl. ¶¶ 40–43.  The Amended Complaint contends that

Plaintiff's discharge was without just cause because: (1) the criminal charges

against Plaintiff were not proven by substantial and credible evidence; (2) the

offense of negligence on which Plaintiff's termination was based is a less serious

offense than intentional theft and merited, at most, a short suspension rather than

discharge; and (3) GT Wilmington's decision to terminate Plaintiff's employment

was based on illegitimate considerations including race.  <u>Id.</u> ¶¶ 44–46.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 12 of 70 PageID #: 182

Consol. C.A. No. 22-01192                                                    Page 12

GT Wilmington moves to dismiss Count I on the grounds that Plaintiff did not enumerate a count for breach of good faith and fair dealing, which GT Wilmington believes would be the appropriate grounds to allege Plaintiff's grievances.  GT Wilmington's Mot. Dismiss at 7.

If an employee's wrongful discharge claim is based upon breach of a collective bargaining agreement, the employee is bound by terms of the agreement that govern the manner in which contractual rights may be enforced.  Vaca v. Sipes, 386 U.S. 171, 184 (1967).  The employee must at least attempt to exhaust exclusive grievance and arbitration procedures established by the bargaining agreement.  Id.  The employee may also seek judicial enforcement of the rights under the collective bargaining agreement if the union that represents the employee, having the exclusive power to carry the grievance procedure through to completion, breaches its duty of fair representation to the plaintiff.  Wilson v. Am. Postal Workers Union, 433 F. Supp. 2d 444, 448 (D. Del. 2006).

GT Wilmington relies on Owens v. Connections Cmty. Support Programs, Inc., 840 F. Supp. 2d 791, 797–98 (D. Del. 2012) to argue that Plaintiff should have alleged his wrongful discharge claim as a "breach of good faith and fair dealing."  GT Wilmington's Mot. Dismiss at 7.  Owens states that a claim based on a breach of the implied covenant of good faith and fair dealing may be appropriate in four situations: (1) when an employee alleges that his termination violated

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 13 of 70 PageID #: 183

Consol. C.A. No. 22-01192                                               Page 13

public policy; (2) an employer misrepresented an important fact upon which the

employee relied; (3) an employer used its superior bargaining power to deprive an

employee of compensation; or (4) the employer falsified or manipulated

employment records to create fictitious grounds for termination.  Owens, 840 F.

Supp. 2d at 798.

Plaintiff's Amended Complaint does not base the wrongful discharge claim

on any of the four situations described in Owens.  Rather, the Amended Complaint

clearly states that Plaintiff's wrongful discharge violated the collective bargaining

agreement.  C.A. No. 22-01441, Am. Compl. ¶¶ 40–46.  A claim for breach of

good faith and fair dealing is therefore not the appropriate claim and GT

Wilmington's Motion to Dismiss based on this issue is denied.

Plaintiff's Amended Complaint claims that Plaintiff was represented by

Local 1694-1 and was covered by the collective bargaining agreement between

Local 1694-1 and GT Wilmington.  Id. ¶ 37.  Plaintiff asserts that he fully

exhausted grievance and arbitration procedures established by the collective

bargaining agreement when Plaintiff filed a grievance through Local 1694-1

challenging GT Wilmington's termination of his employment.  Id. ¶¶ 22–29, 39.

The Amended Complaint contends that on December 15, 2020, Local 1694-1's

Executive Board voted unanimously to take Plaintiff's grievance to arbitration

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 14 of 70 PageID #: 184

Consol. C.A. No. 22-01192                                              Page 14

when settlement failed and an arbitration hearing was scheduled for May 17, 2021. Id. ¶ 25.

Plaintiff argues that after the dissolution of Local 1694-1, Local 1694 agreed to honor existing contractual arrangements and to assume all collective bargaining duties and responsibilities undertaken by Local 1694-1 before the merger. Id. ¶¶ 26–27. Plaintiff asserts that Local 1694 withdrew Plaintiff's grievance from arbitration at the end of March 2021 in violation of the Merger Agreement and in breach of Local 1694's duty of fair representation. Id. ¶ 28. Plaintiff alleges that after Local 1694 withdrew the grievance from arbitration, Plaintiff sought to move forward with the arbitration on his own, but the arbitration was cancelled and the case was closed. Id.

Plaintiff's allegations, viewed in favor of Plaintiff as the non-moving party, meet the Iqbal/Twombly standard by showing that Plaintiff attempted to exhaust the grievance and arbitration procedures established by the collective bargaining agreement, but was unsuccessful as a result of Local 1694's purported breach of its duty of representation when Local 1694 withdrew Plaintiff's grievance and refused to reinstate it. The Court holds that, at this early stage in the proceedings, Plaintiff has sufficiently pled his claim of wrongful discharge without just cause in violation of the collective bargaining agreement.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 15 of 70 PageID #: 185

Consol. C.A. No. 22-01192                                      Page 15

### B.   Counts II and VII: State Law and Constitutional Malicious Prosecution

In Count II, Plaintiff asserts that GT Wilmington is liable for malicious prosecution under Delaware law because GT Wilmington made a false statement to the police when filing criminal charges.  C.A. No. 22-01441, Am. Compl. ¶¶ 47–53.  In Count VII, Plaintiff claims that GT Wilmington violated Plaintiff's right to be free from malicious prosecution under the Fourth Amendment of the U.S. Constitution, pursuant to 42 U.S.C. § 1983.

GT Wilmington moves to dismiss both the state law and constitutional malicious prosecution claims on grounds that the charges against Plaintiff "were dismissed through *nolle prosequi*" by the prosecutor's office, but the record does not reflect the manner in which the charges were dismissed.  GT Wilmington's Mot. Dismiss at 4.  GT Wilmington does not differentiate between the state and federal malicious prosecution claims.  Id.

Under Delaware law, to establish malicious prosecution, a plaintiff must show that: (1) there was "a prior institution or continuation of some regular judicial proceedings against the plaintiff;" (2) the proceedings were initiated by the defendant; (3) the proceedings were terminated in plaintiff's favor; (4) defendant acted with malice in instituting the proceedings; (5) there was a lack of probable cause for the institution of the proceedings; and (6) plaintiff suffered injury of

Case 1:22-cv-01192-JCG    Document 29    Filed 06/24/24    Page 16 of 70 PageID #: 186

Consol. C.A. No. 22-01192                                                      Page 16

damage as a result of the former proceedings.  Glover v. City of Wilmington, 966

F. Supp. 2d 417, 426 (D. Del. 2013) (quoting Quartarone v. Kohl's Dept. Stores,

Inc., 983 A.2d 949, 954–55 (Del. Super. Ct. 2009)); see also Stidham v. Diamond

State Brewery, Inc., 41 Del. 330, 332 (Del. Super. Ct. 1941).  Delaware considers

an entry of *nolle prosequi* to be sufficient to satisfy the element that the

proceedings were terminated in the favor of the now-plaintiff.  Glover, 966 F.

Supp. 2d at 426 (citing Quartarone, 983 A.2d at 958; Stidham, 41 Del. at 333).

> 42 U.S.C. § 1983 provides that:
>
> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  The federal elements of malicious prosecution pursuant to 42

U.S.C. § 1983 require a plaintiff to show that: (1) the defendant initiated a criminal

proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the

proceeding was initiated without probable cause; (4) the defendant acted

maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the

plaintiff suffered deprivation of liberty consistent with the concept of seizure as a

consequence of a legal proceeding.  McKenna v. City of Phila., 582 F.3d 447, 461

(3d Cir. 2009).  A plaintiff is not required to show that the criminal prosecution

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 17 of 70 PageID #: 187

Consol. C.A. No. 22-01192                                          Page 17

ended with some affirmative indication of innocence, but need only show that the criminal prosecution ended without a conviction. <u>Thompson v. Clark</u>, 142 S. Ct. 1332, 1341 (2022).

In the Amended Complaint, Plaintiff asserts that on November 17, 2020, GT Wilmington fired Plaintiff on the basis that Plaintiff "knowingly allow[ed] the unauthorized distribution of fuel" to Miller, who was not entitled to receive fuel. C.A. No. 22-01441, Am. Compl. ¶ 21.  Plaintiff further contends that on December 7, 2020, GT Wilmington abandoned its claim that Plaintiff acted intentionally and claimed instead that his discharge was justified because Plaintiff negligently allowed Miller to pump gas and negligently failed to notify management of the alleged theft. <u>Id.</u> ¶ 23.  Plaintiff claims that on December 22, 2020, Custis informed the Wilmington Police Department that Plaintiff had conspired with Miller and had stolen gasoline, leading to Plaintiff being charged falsely with two criminal offenses of theft and conspiracy to commit theft. <u>Id.</u> ¶¶ 30–31.  Plaintiff argues that he learned of the outstanding arrest warrant on January 2, 2021 and turned himself in at a Wilmington police station on January 5, 2021.  <u>Id.</u> ¶ 32.

With respect to the criminal charges, Plaintiff asserts that GT Wilmington did not claim or believe that Plaintiff intentionally deprived GT Wilmington of its property, an essential element of theft and conspiracy to commit theft, and that GT Wilmington acted with malice because it wanted to remove Plaintiff from the Port

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 18 of 70 PageID #: 188

Consol. C.A. No. 22-01192                                                    Page 18

as a result of Plaintiff's aggressive filing of grievances on behalf of union

members.  Id. ¶¶ 30, 49.  Plaintiff contends that the criminal charges were

dismissed by the prosecutor's office through *nolle prosequi* due to lack of

evidence.  Id. ¶¶ 34, 51.  Plaintiff claims that he suffered emotional distress, mental

anguish, shame, and humiliation as a direct and proximate result of the malicious

prosecution.  Id. ¶ 49.  Plaintiff also asserts that GT Wilmington's officials did not

have probable cause or reasonable grounds to believe that Plaintiff was guilty of

intentionally committing theft and conspiracy to commit theft when the charges

were filed.  Id. ¶ 50.

        The alleged facts, viewed in the light most favorable to Plaintiff as the non-

moving party, support the inference that the actions of GT Wilmington constituted

malicious prosecution under Delaware law.  By the time that GT Wilmington

informed the Wilmington Police Department of Plaintiff's alleged theft and

conspiracy to commit theft, GT Wilmington had abandoned the claim that Plaintiff

acted with intent to deprive GT Wilmington of the gasoline pumped by Miller and

deemed Plaintiff's actions to be negligent.  Id. ¶¶ 23, 30–31.  Considering this

alleged fact, it can be plausibly inferred that GT Wilmington's institution of the

theft and conspiracy to commit theft charges was with malice and without probable

cause.  Furthermore, Plaintiff has shown that the charges were resolved in his favor

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 19 of 70 PageID #: 189

Consol. C.A. No. 22-01192                                                    Page 19

via *nolle prosequi*, which Delaware recognizes as sufficient to prove that the criminal proceeding ended in Plaintiff's favor.

GT Wilmington's motion to dismiss does not address whether GT Wilmington acted with malice in instituting the theft and conspiracy to commit charges against Plaintiff. Rather, the motion to dismiss focuses on the element of favorability and argues that a dismissal via *nolle prosequi* is insufficient to meet the element if the reason is not indicated on the record. As explained in Glover, Delaware courts have generally treated the entry of *nolle prosequi* as sufficient by itself to meet the element of favorability. Glover, 966 F. Supp. 2d at 426 (citing Quartarone, 983 A.2d at 958; Stidham, 41 Del. at 333).

Accordingly, the Court holds that Counts II sufficiently pleads malicious prosecution under Delaware law.

As for the Fourth Amendment malicious prosecution claim, Plaintiff's Amended Complaint does not assert that GT Wilmington or Custis acted under color of any Delaware statute, ordinance, regulation, custom, or usage, as provided in 42 U.S.C. § 1983, when they filed criminal charges against Plaintiff. Furthermore, Plaintiff's Amended Complaint does not contain allegations establishing that GT Wilmington or Custis are "persons" within the meaning of 42 U.S.C. § 1983. Therefore, the Court holds that Count VII does not sufficiently

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 20 of 70 PageID #: 190

Consol. C.A. No. 22-01192                                                Page 20

plead a Fourth Amendment malicious prosecution claim pursuant to 42 U.S.C. § 1983.

### C.    Count III: Intentional Infliction of Emotional Distress

Count III alleges that GT Wilmington's actions in causing Plaintiff to be arrested constituted intentional infliction of emotional distress ("IIED").  C.A. No. 22-01441, Am. Compl. ¶¶ 54–58.

GT Wilmington moves to dismiss Plaintiff's IIED claim on grounds that Plaintiff merely makes conclusory statements that he suffered severe emotional distress as a direct and proximate cause of GT Wilmington's alleged conduct, and argues that Plaintiff fails to offer sufficient evidence in support of these conclusory statements.  GT Wilmington's Mot. Dismiss at 4–5.

Under Delaware law, a claim for IIED requires a plaintiff to prove that a defendant intentionally engaged in extreme or outrageous conduct that caused the plaintiff severe emotional distress.  Kade v. Workie, 238 F. Supp. 3d 625, 635–36 (D. Del. 2017) (citing Hunt ex rel. DeSombre v. State, Dep't of Safety & Homeland Sec., Div. of Delaware State Police, 69 A.3d 360, 367 (Del. 2013)).  A defendant's conduct is considered to be outrageous if it "exceeds the bounds of decency and is regarded as intolerable in a civilized community."  Hunt ex rel. DeSombre, 69 A.3d at 367.  "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 21 of 70 PageID #: 191

Consol. C.A. No. 22-01192                                                      Page 21

outrageous as to permit recovery[.]" <u>Id.</u> "If reasonable minds may differ, the question of whether the conduct is extreme and outrageous is for the jury." <u>Id.</u> A defendant's conduct that is characterized as extreme and outrageous may arise from an abuse of a position, or a relation with the plaintiff, which gives the defendant actual or apparent authority over the plaintiff, or power to affect his interests. <u>Id.</u> at 368. Mere insults, indignities, or annoyances are not deemed to be extreme or outrageous. <u>Id.</u> A defendant's conduct must be intentional or reckless to cause severe emotional distress to a plaintiff. <u>Kade</u>, 238 F. Supp. 3d at 636 (citing <u>Fanean v. Rite Aid Corp. of Delaware</u>, 984 A.2d 812, 818 (Del. Super. Ct. 2009)).

Plaintiff's Amended Complaint claims that in addition to firing him, GT Wilmington imposed a lifetime ban on Plaintiff from entering the Port, thereby precluding his future employment by other employers operating at the Port. C.A. No. 22-01441, Am. Compl. ¶¶ 20–21. Plaintiff asserts that GT Wilmington, through its agents or employees, filed false criminal charges against Plaintiff and requested that the New Castle County Court enter a No Contact Order that barred Plaintiff from entering the Port. <u>Id.</u> ¶¶ 30–31. Plaintiff further asserts that even after the New Castle County Court lifted the No Contact Order, GT Wilmington continued to ban Plaintiff from entering the Port. <u>Id.</u> ¶ 33. Plaintiff contends that GT Wilmington's conduct of permanently banning him from the Port even after

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 22 of 70 PageID #: 192

Consol. C.A. No. 22-01192                                              Page 22

the No Contact Order was lifted, permanently barring Plaintiff from securing

employment with other employers operating at the Port, and having Plaintiff

arrested on false charges, amounted to outrageous and intolerable conduct in a

civilized community.  Id. ¶¶ 20–21, 30–33, 55.  Plaintiff also claims that, as a

result of GT Wilmington's conduct, he suffered severe emotional distress.  Id. ¶¶

56–57.

The Court concludes that these allegations, taken together and viewed in the

light most favorable to Plaintiff as the non-movant, plausibly support an inference

that Plaintiff suffered severe emotional distress from being permanently banned

from the Port, being unable to secure gainful employment, and being subjected to

criminal theft and conspiracy charges that GT Wilmington knew or should have

known were unsupported or false.  Plaintiff's allegations go beyond mere insults,

indignities, or annoyances, and support an inference that GT Wilmington's conduct

was outrageous and intentional, especially considering that the prosecutor's office

dismissed the criminal charges through *nolle prosequi*, and the New Castle County

Court lifted the No Contact Order and allowed Plaintiff to access the Port.

The Court holds that Plaintiff's IIED claim is sufficiently pled.

### D.    Count IV: Compelled Self-Defamation

In Count IV, Plaintiff alleges compelled self-defamation.  C.A. No. 22-

01441, Am. Compl. ¶¶ 59–64.  GT Wilmington moves to dismiss Count IV on the

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 23 of 70 PageID #: 193

Consol. C.A. No. 22-01192                                                    Page 23

grounds that Plaintiff does not establish the required elements to prove defamation because Plaintiff states only that the statements are false.  GT Wilmington's Mot. Dismiss at 5–6.

The Court observes that Plaintiff includes a claim of "compelled self-defamation," but fails to identify the specific state or federal law on which the claim is based.  Furthermore, Plaintiff does not distinguish between "compelled self-defamation" and "defamation," and the Parties appear to define the compelled self-defamation claim using elements of defamation.  In Plaintiff's Motion for Preliminary Injunction, Plaintiff acknowledges that Delaware does not recognize the claim of compelled self-defamation and relies instead on the elements of compelled self-defamation in Missouri and the Eighth Circuit.  Pl.'s Br. at 18 n.4. Delaware does not appear to recognize "compelled self-defamation" as an actionable claim.

Because Plaintiff has not stated a cause of action recognized in this jurisdiction upon which relief may be granted, the Court dismisses Plaintiff's compelled self-defamation claim.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 24 of 70 PageID #: 194

Consol. C.A. No. 22-01192                                                    Page 24

### E.    Count VI: Tortious Interference with Prospective Economic Advantage

Count VI of Plaintiff's Amended Complaint alleges that GT Wilmington tortiously interfered with Plaintiff's prospective economic advantage.  C.A. No. 22-01441, Am. Compl. ¶¶ 73–77.

GT Wilmington moves to dismiss Count VI, arguing that Plaintiff fails to offer evidence or plead facts showing that GT Wilmington was made aware of Plaintiff's valid business expectancy.  GT Wilmington's Mot. Dismiss at 6–7.

Under Delaware law, to establish a claim for tortious interference with a prospective economic advantage, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference that induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.  Enzo Life Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 429 (D. Del. 2003) (citing Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc., 5 F. Supp. 2d 238, 243 (D. Del. 1998)).  The conduct underlying a claim for tortious interference with prospective economic advantage must be wrongful.  See KT4 Partners, LLC v. Palantir Techs., Inc., 2018 WL 4033767, at *6 (Del. Super. Ct. Aug. 22, 2018) ("[A] plaintiff must also allege that the conduct was 'wrongful' to support a claim for tortious

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 25 of 70 PageID #: 195

Consol. C.A. No. 22-01192                                                    Page 25

interference with prospective economic advantage . . . .").  In determining whether conduct was wrongful, Delaware courts consider the factors in the Restatement (Second) of Torts:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979); see also KT4 Partners, 2018 WL 4033767, at *6.

Plaintiff asserts that he had a valid business expectancy of employment by other employers operating at the Port.  C.A. No. 22-01441, Am. Compl. ¶ 74. Plaintiff claims that after his employment with GT Wilmington was terminated, he was hired by Delaware River Stevedoring ("DRS") in March 2022 to work at the Port.  Id.  Plaintiff contends that on the evening of March 19, 2022, GT Wilmington's security officers instructed him to leave the Port, thereby denying Plaintiff gainful employment with DRS.  Id.  Plaintiff further asserts that GT Wilmington's conduct of imposing a permanent lifetime ban from entering the Port, even after the New Castle County Court lifted the No Contact Order, intentionally interfered with his prospective economic advantage without legal justification or privilege.  Id. ¶¶ 20–21, 33, 76.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 26 of 70 PageID #: 196

Consol. C.A. No. 22-01192                                                    Page 26

Plaintiff also asserts that GT Wilmington's conduct of having him arrested on criminal charges impugned and damaged Plaintiff's professional reputation and standing.  Id. ¶¶ 30–31, 76.  Plaintiff claims that he suffered significant financial losses as a consequence of GT Wilmington's misconduct.  Id. ¶ 77.  Plaintiff argues that GT Wilmington's conduct in permanently banning Plaintiff from the Port interferes with his prospective economic advantage without legal justification or privilege.  Id. ¶ 76.

Plaintiff's allegations, accepted as true and viewed in the light most favorable to him as the non-movant, support a plausible inference that Plaintiff had a valid business expectation based on decades of work experience at the Port, which is evinced by his employment offer with DRS in March 2022.  The allegations plausibly support an inference that GT Wilmington knew or should have known of this business expectation that Plaintiff would seek employment with another employer at the Port.  The allegations also plausibly support an inference that GT Wilmington interfered with Plaintiff's business expectation when GT Wilmington imposed a lifetime ban on Plaintiff from entering the Port and instructed Plaintiff to leave the Port after Plaintiff secured gainful employment with another employer at the Port two years after his termination.  With respect to damages, the allegations support an inference that Plaintiff suffered financial loss as a result of losing his income from the employment opportunity with DRS.  The

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 27 of 70 PageID #: 197

Consol. C.A. No. 22-01192                                          Page 27

allegations also plausibly support an inference that GT Wilmington's conduct in imposing a lifetime ban on Plaintiff from entering the Port is wrongful because the lifetime ban is alleged to have no legal justification or privilege.

Viewing the facts in the light most favorable to Plaintiff as the non-movant, the Court concludes that Plaintiff has sufficiently alleged that GT Wilmington's permanent ban of Plaintiff from accessing the Port, even after the New Castle County Court lifted the No Contact Order, supports a plausible inference that GT Wilmington's conduct was wrongful and interfered with Plaintiff's ability to secure gainful employment.

Accordingly, the Court holds that Plaintiff has sufficiently pled his claim for tortious interference with prospective economic advantage.

### F.    Count V: Racial Discrimination

Count V alleges that GT Wilmington engaged in racial discrimination in violation of 42 U.S.C. §1981.  C.A. No. 22-01441, Am. Compl. ¶¶ 65–72.

GT Wilmington moves to dismiss Count V, arguing that Plaintiff fails to state where the alleged acts of racial discrimination took place or when they occurred.  GT Wilmington's Mot. Dismiss at 7–8.

42 U.S.C. § 1981 prohibits racial discrimination in the context of making or enforcing contracts and transactions of property:

Consol. C.A. No. 22-01192                                                    Page 28

> All persons within the jurisdiction of the United States shall have the
> same right in every State and Territory to make and enforce contracts,
> to sue, be parties, give evidence, and to the full and equal benefit of all
> laws and proceedings for the security of persons and property as is
> enjoyed by white citizens, and shall be subject to like punishment,
> pains, penalties, taxes, licenses, and exactions of every kind, and to no
> other.

42 U.S.C. § 1981(a). In order to succeed on a claim under 42 U.S.C. § 1981, a

plaintiff must demonstrate: (1) that he belongs to a racial minority; (2) defendant's

intent to discriminate on the basis of race; and (3) discrimination concerning one or

more of the activities enumerated in 42 U.S.C. § 1981, including the right to make

and enforce contracts. Pryor v. National Collegiate Athletic Ass'n, 288 F.3d 548,

569 (3d Cir. 2002). "[42 U.S.C. §] 1981 offers relief when racial discrimination

blocks the creation of a contractual relationship, as well as when racial

discrimination impairs an existing contractual relationship." Domino's Pizza, Inc.

v. McDonald, 546 U.S. 470, 476 (2006). The protections of 42 U.S.C. § 1981

apply to all contracts. Rivers v. Roadway Express, Inc., 511 U.S. 298, 304 (1994).

Racial discrimination cases pursuant to 42 U.S.C. § 1981 are analyzed under

a burden-shifting framework, which requires a plaintiff to first establish a *prima

facie* case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792,

803 (1973); see Harvey v. Int'l Reading Ass'n, Inc., 838 F. Supp. 2d 244 (D. Del.

2012). "The central focus of the *prima facie* case is always whether the employer

is treating some people less favorably than others because of their race . . . ."

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 29 of 70 PageID #: 199

Consol. C.A. No. 22-01192                                                Page 29

Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (quoting Pivirotto v.
Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999)); see also Haskins v.
Christiana Care Health Servs., 701 F. Supp. 2d 623, 627–28 (D. Del. 2010).  A
plaintiff may support a circumstantial inference of discrimination in many ways,
but must produce "evidence adequate to create an inference that an employment
decision was based on a[n] [illegal] discriminatory criterion . . . . "  Pivirotto, 191
F.3d at 355 (quoting O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312
(1996)) (alterations in original).

In order to support an inference of discrimination necessary to establish a
prima facie case, a plaintiff must demonstrate either that: (1) similarly situated
persons who are not members of the protected class were treated more favorably;
or (2) that the circumstances of his termination give rise to an inference of
discrimination.  See McDonnell Douglas, 411 U.S. at 802; Jones v. Sch. Dist. of
Philadelphia, 198 F.3d 403, 410–411 (3d Cir. 1999).  A plaintiff alleging racial
discrimination cannot pick and choose persons perceived to be valid comparables,
but must choose similar employees against whom to compare himself.  Donlin v.
Philips Lighting N. Am. Corp., 581 F.3d 73, 90 (3d Cir. 2009).  "Similarly
situated" employees need not be "identically situated" in order to be valid
comparators, but in order for a co-employee to be an appropriate comparator, he
should hold a similar position, report to the same supervisor, possess a similar

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 30 of 70 PageID #: 200

Consol. C.A. No. 22-01192                                                Page 30

disciplinary record, and engage in the same type of misconduct as the plaintiff.

Haskins, 701 F. Supp. 2d at 629.

Plaintiff's Amended Complaint states that Plaintiff is of Caucasian descent.

C.A. No. 22-01441, Am. Compl. ¶ 67.  Plaintiff claims in Count V that GT

Wilmington treated him, a Caucasian employee, and Miller, an African American

employee, as if they were similarly situated by firing them both, even though

Miller was the alleged active wrongdoer who intentionally deprived GT

Wilmington of eighteen gallons of its gasoline while Plaintiff was, at most, an

enabler, who negligently failed to prevent (or report) Miller's alleged theft.  Id.

Plaintiff contends that GT Wilmington fired him in order to stave off a potential

lawsuit by Miller claiming disparate treatment based on race.  Id. ¶ 68.  Plaintiff

argues that GT Wilmington has disciplined African American employees more

leniently than similarly situated Caucasian employees.  Id. ¶ 69.  Plaintiff offers

two examples: Eric Henry, an African American employee employed by GT

Wilmington, was caught stealing but was not fired, and Dion Brown, an African

American employee, was charged with the negligent operation of a crane, but was

not fired even though his negligence, in contrast to Plaintiff's alleged negligence,

placed lives at risk.  Id.  Plaintiff claims that in 2021, GT Wilmington faced labor

shortages at the Port as a result of an economic upsurge during the pandemic and

reinstated several African American employees, but not a single Caucasian

employee, including Plaintiff, whose seniority was far greater than that of the African American employees reinstated.  Id. ¶¶ 70–71.

Taking the factual allegations as true and viewing them in the light most favorable to Plaintiff as the non-movant, the Court concludes that Plaintiff's allegations plausibly support an inference that GT Wilmington treated Plaintiff differently than African American employees who were similarly situated.  At this stage of the proceedings, the allegations raise a reasonable expectation that discovery will reveal evidence supporting Plaintiff's claim, such as information regarding the supervisors, employment history, and disciplinary records of the employees Plaintiff chose as comparators.  See Twombly, 550 U.S. at 555 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the required element).  Plaintiff's assertions regarding GT Wilmington's treatment of Dion Brown and Eric Henry, and GT Wilmington's alleged decision to only reinstate the employment of African American employees show that the circumstances of Plaintiff's termination support a plausible inference of disparate treatment based on race.

Accordingly, the Court holds that Plaintiff has sufficiently pled racial discrimination in violation of 42 U.S.C. §1981.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 32 of 70 PageID #: 202

Consol. C.A. No. 22-01192                                                    Page 32

## II.     Motion for Preliminary Injunction (C.A. No. 22-01441)

Plaintiff seeks a preliminary injunction against GT Wilmington and requests

that the Court enter an order enjoining GT Wilmington's permanent ban of

Plaintiff from the Port and GT Wilmington's alleged interference with Plaintiff's

job search and employment at the Port, and ordering GT Wilmington to reserve

$750,000 to satisfy a potential final judgment in Plaintiff's favor.  Pl.'s Mot. at 1–

2.

A party seeking to obtain a preliminary injunction must establish: "(1) a

likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the

injunction is denied; (3) that granting preliminary relief will not result in even

greater harm to the nonmoving party; and (4) that the public interest favors such

relief."  Lane v. New Jersey, 725 Fed. App'x 185, 187 (3d Cir. 2018) (quoting Kos

Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004)).  The moving

party bears the burden of demonstrating the necessity of a preliminary injunction

that will alter the status quo.  Id. (citing Acierno v. New Castle County, 40 F.3d

645, 653 (3d Cir. 1994)).  If a party establishes the first two factors, the Court is

required to consider the remaining two factors—the balance of the equities and the

public interest.  Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017).

The Court must then determine "in its sound discretion if all four factors, taken

together, balance in favor of granting the requested preliminary relief."  Id.

Because preliminary injunctive relief is an extraordinary remedy, it should be granted only in limited circumstances.  Milhouse v. Fasciana, 721 Fed. App'x 109, 111 (3d Cir. 2018); Kos Pharms., Inc., 369 F.3d at 708.

### A.     Likelihood of Plaintiff's Success on the Merits

Demonstrating a likelihood of success on the merits requires only that the party "prove a *prima facie* case, not a certainty that he or she will win."  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).  The party seeking a preliminary injunction only needs to show that he has a reasonable probability of eventual success in the litigation, but not necessarily that he is more likely than not to succeed.  Reilly, 858 F.3d at 176, 179 n.3.

As discussed above in Section I, Plaintiff has sufficiently pled the factual allegations for malicious prosecution under Delaware law, tortious interference with prospective economic advantage, discharge in violation of a collective bargaining agreement, racial discrimination, and intentional infliction of emotional distress.  Based on these claims that have been sufficiently pled at this stage of litigation, Plaintiff has established a likelihood of success for claims against GT Wilmington.

### B.     Irreparable Harm to Plaintiff

Irreparable harm is "potential harm which cannot be redressed by a legal or an equitable remedy following a trial.  The preliminary injunction must be the only

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 34 of 70 PageID #: 204

Consol. C.A. No. 22-01192                                          Page 34

way of protecting the plaintiff from harm." <u>Siemens USA Holdings Inc. v.
Geisenberger</u>, 17 F.4th 393, 407–08 (3d Cir. 2021) (quoting <u>Campbell Soup Co. v.
ConAgra, Inc.</u>, 977 F.2d 86, 91 (3d Cir. 1992)).  Additionally, the requisite harm
that is considered to be irreparable "must be of a peculiar nature, so that
compensation in money cannot atone for it," not merely serious or substantial.  <u>Id.</u>
(quoting <u>Campbell Soup</u>, 977 F.2d at 91–92).  Plaintiff must establish that there is
more than just a risk of harm and must make a clear showing that the irreparable
injury is immediate.  <u>Campbell Soup</u>, 977 F.2d at 91–92.

    Plaintiff argues that three factors combine to establish irreparable harm:
(1) GT Wilmington's permanent ban of Plaintiff from the Port; (2) GT
Wilmington's threatened bankruptcy; and (3) GT Wilmington's ongoing defiance
of a court order.  Pl.'s Br. at 6–11.  GT Wilmington's alleged defiance of a court
order is related to its permanent ban of Plaintiff from the Port notwithstanding the
New Castle County Court's lifting of the No Contact Order.

### 1.    GT Wilmington's Permanent Ban of Plaintiff from the Port and its Effect on Plaintiff's Future Employment Opportunities

    Plaintiff argues that irreparable harm has been caused by GT Wilmington's
permanent ban of Plaintiff from the Port because the lifetime ban was a highly
unusual consequence of the termination of his employment.  Pl.'s Br. at 7.
Plaintiff asserts that he may face personal bankruptcy because the permanent ban

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 35 of 70 PageID #: 205

Consol. C.A. No. 22-01192                                                    Page 35

has left him without regular income for more than two years and has severely

depleted his savings; Plaintiff argues that he worked for over thirty-five years at

the Port and that employment opportunities at the Port cannot be replicated

elsewhere.  Id. at 7, 19.  Plaintiff further asserts that because of his age, he cannot

be expected to venture into a new career field for which he does not have the

requisite skill set, nor does he have many productive years remaining to work in

jobs that are physically demanding.  Id. at 9.  Plaintiff also contends that

irreparable harm is immediate because GT Wilmington is in violation of a

February 1, 2021 New Castle County Court order that lifted GT Wilmington's No

Contact Order and allowed Plaintiff to return to his place of employment at the

Port.  Id. at 11 (citing Pl.'s Br. at Ex. F).

    GT Wilmington counters that all of Plaintiff's requests are based on

monetary compensation because Plaintiff is requesting that GT Wilmington's ban

of Plaintiff from the Port be lifted so that Plaintiff can earn a living.  GT

Wilmington's Resp. at 6.  GT Wilmington asserts that because Plaintiff's requests

seek monetary compensation, preliminary injunctive relief is not proper.  Id. at 4–

7.

    If a party claims that loss of earnings or damage to reputation afford a basis

for finding irreparable harm, "[m]ere injuries, however substantial, in terms of

money, time, and energy necessarily expended in the absence of a stay, are not

enough." Kos Pharms., 369 F.3d at 728. "An insufficiency of savings or

difficulties in immediately obtaining other employment—external factors common

to most discharged employees and not attributable to any unusual actions relating

to the discharge itself—will not support a finding of irreparable injury, however

severely they may affect a particular individual." Sampson v. Murray, 415 U.S.

61, 92 n.68 (1974). This does not foreclose preliminary injunctive relief in

genuinely extraordinary situations such as when "the circumstances surrounding

an employee's discharge, together with the resultant effect on the employee, may

so far depart from the normal situation that irreparable injury might be found." Id.

Showing some potential harm to reputation is usually insufficient to support a

conclusion that irreparable harm exists, unless a party can show that he is

potentially barred, not merely impaired, from employment. See Acierno, 40 F.3d

at 654 (citing Morton v. Beyer, 822 F.2d 364, 372 n.13 (3d Cir. 1987)); see also

Fitzgerald v. Mountain Laurel Racing, Inc., 607 F.2d 589, 598, 601 (3d Cir. 1979).

Plaintiff's request for preliminary injunction is based on the fact that GT

Wilmington permanently banned him from entering the Port, thereby affecting his

ability to secure future employment with all employers at the Port. This permanent

lifetime ban is a peculiar action that deviates from the norm, as evinced by

Plaintiff's observation that he has not seen an employee banned from the Port

during his tenure of over thirty years, which GT Wilmington neither addresses nor

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 37 of 70 PageID #: 207

Consol. C.A. No. 22-01192                                                    Page 37

disputes.  See Pl.'s Br. at 7.  The highly unusual nature of Plaintiff's permanent ban from the Port is further illustrated by the fact that Plaintiff is prevented from pursuing other employment opportunities, even though the New Castle County Court modified GT Wilmington's No Contact Order on February 1, 2021 to allow Plaintiff to "return to his place of employment: [the] Port of Wilmington."  Pl.'s Br. at Ex. F.

The Court notes that when GT Wilmington terminated Plaintiff's employment, GT Wilmington offered no explanation as to why the permanent ban from the Port was justified and was the most appropriate course of action.  See Pl.'s Br. at Ex. A (showing GT Wilmington's record of discipline stating that GT Wilmington "reserves the right to terminate [Plaintiff] and issue a permanent ban from entering the Port.").  In its response to Plaintiff's Motion for Preliminary Injunction, GT Wilmington does not explain why permanently banning Plaintiff from entering the Port of Wilmington is warranted, particularly after the New Castle County Court lifted the No Contact Order to allow Plaintiff to enter the Port to seek employment.

Although a terminated employee may normally face some difficulty in immediately obtaining new employment opportunities, the Court finds that the permanent ban from the Port is an "unusual action relating to the discharge itself" because the permanent ban bars Plaintiff from seeking any future employment

opportunities at the Port.  See Sampson, 415 U.S. at 92 n.68; Acierno, 40 F.3d at

654.  GT Wilmington neither addresses nor disputes the fact that the employment

opportunities available at the Port are not replicated elsewhere.

The unusual circumstances in this case demonstrate that Plaintiff is suffering

more than just mere injuries that can be remedied with monetary compensation.

Even if Plaintiff's lost wages to date can later be remedied with monetary

compensation, the immediate effect of the permanent ban is restricting Plaintiff

from securing any future employment in the most appropriate place he can work

that utilizes his set of skills.  Regardless of whether GT Wilmington's termination

of Plaintiff was justified, a past employer should not be permitted to prevent

Plaintiff from obtaining future employment at the entire Port of Wilmington with

all potential employers.

The Court concludes that this deprivation of all future employment

opportunities goes beyond mere impairment of employment, is highly unusual, and

deviates from the norm expected when an employee faces an adverse employment

action.  Thus, Plaintiff has established satisfactorily that he will suffer irreparable

harm if the preliminary injunction is not granted with respect to GT Wilmington's

permanent ban of Plaintiff from the Port and if GT Wilmington is not enjoined

from preventing Plaintiff from seeking future employment opportunities at the

Port.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 39 of 70 PageID #: 209

Consol. C.A. No. 22-01192                                                    Page 39

## 2.    Reserving Monetary Judgment

Plaintiff contends that irreparable harm is also established because of GT Wilmington's potential insolvency.  Pl.'s Br. at 10–11.  Plaintiff argues that even though courts are reluctant to grant injunctions when a party's financial losses can be recouped, if a defendant's ability to pay jeopardizes the plaintiff's ability to collect a final judgment, the factor of irreparable harm is considered to be satisfied. Id. at 10.  To support his argument regarding GT Wilmington's ability to pay, Plaintiff points to several newspaper articles showing that GT Wilmington owes approximately $31 million and has suffered "two 'tumultuous' years of lawsuits and financial losses."  Id. (citing Pl.'s Br. at Ex. G).  Plaintiff asserts that because of these financial issues, a preliminary injunction is necessary to establish an adequate reserve for Plaintiff's judgment.  Id. at 11.

GT Wilmington argues that Plaintiff has not established irreparable harm with respect to the request for preliminary injunctive relief requiring GT Wilmington to set aside funds for monetary compensation.  GT Wilmington's Resp. at 6–7.  GT Wilmington argues that insolvency is not likely to arise due to Plaintiff's judgment because GT Wilmington is insured.  Id. at 7.  GT Wilmington further asserts that its financial status in the exhibited article is irrelevant to Plaintiff's ability to recover upon a favorable judgment.  Id.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 40 of 70 PageID #: 210

Consol. C.A. No. 22-01192                                                Page 40

In some instances, evidence showing that a defendant is unable to satisfy a monetary judgment has been deemed sufficient to establish irreparable injury. Symbol Techs., Inc. v. Janam Techs. LLC, 729 F. Supp. 2d 646, 665 (D. Del. 2010) (citing Eli Lilly & Co. v. Premo Pharm. Labs., Inc., 630 F.2d 120, 137 (3d Cir. 1980)) (affirming district court's finding of irreparable harm when "damages could very conceivably run beyond a defendant's ability to pay them.").  The U.S. Court of Appeals for the Third Circuit ("Third Circuit") has affirmed a district court's issuance of a preliminary injunction to protect a potential damages remedy if a plaintiff demonstrates the requirements necessary for preliminary injunctive relief.  Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 197 (3d Cir. 1990).

This remedy is not appropriate in an ordinary damages action.  Id.  A plaintiff must show not only that there is a likelihood to become entitled to the encumbered funds upon final judgment, but also that the plaintiff will probably be unable to recover those funds without the preliminary injunction.  Elliott v. Kiesewetter, 98 F.3d 47, 57 (3d Cir. 1996).  To establish irreparable harm for the purpose of obtaining preliminary injunctive relief to protect a money judgment, a plaintiff may show that the relief is necessary to prevent consumption, dissipation, or fraudulent conveyance of the assets from which judgment can be recovered. See Elliott, 98 F.3d at 58 ("[W]e hold that a court may find that a party seeking an asset freeze to preserve a money judgment may show irreparable injury by

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 41 of 70 PageID #: 211

Consol. C.A. No. 22-01192                                             Page 41

showing that the freeze is necessary to prevent the consumption, dissipation or fraudulent conveyance of the assets that the party pursuing the asset freeze seeks to recover in the underlying litigation.").

With respect to irreparable harm, Plaintiff has proffered only one newspaper article from 2018 showing that GT Wilmington was facing financial hardships as a result of debts and lawsuits. Pl.'s Br. at Ex. G. GT Wilmington argues that regardless of these hardships, its ability to pay will not be hindered because it is insured and will be able to pay Plaintiff's monetary judgment. Plaintiff has failed to offer evidence to address the potential consumption, dissipation, or fraudulent conveyance of the assets of GT Wilmington.

Plaintiff has not shown that the hardships faced by GT Wilmington demand extraordinary measures warranting securing the assets from which Plaintiff can recover. Accordingly, the Court holds that Plaintiff has failed to establish irreparable harm that would justify preliminary injunctive relief requiring GT Wilmington to reserve funds to protect Plaintiff's future judgment.

### C.   Harm to GT Wilmington if Preliminary Injunctive Relief is Granted

The Court now considers the balance of the hardships to the Parties with respect to the lifting of GT Wilmington's permanent ban of Plaintiff from entering the Port and the effect of the ban on Plaintiff's future employment.

In considering whether granting preliminary injunctive relief will result in even greater harm to the nonmoving party, a court must balance the hardships to the respective Parties.  See Kos Pharms., 369 F.3d at 727 (citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 197 (3d Cir. 1990)).

GT Wilmington argues that granting a preliminary injunction will change GT Wilmington's position by allowing Plaintiff entry to the Port.  GT Wilmington's Resp. at 11–12.

Plaintiff argues that GT Wilmington does not lose anything if the preliminary injunction is granted, other than its ability to continue barring Plaintiff from entering the Port.  Pl.'s Br. at 19.  Plaintiff also contends that he will suffer greater harm than GT Wilmington because of the loss of his ability to earn a living and being forced into personal bankruptcy.  Id.

Although GT Wilmington argues that granting a preliminary injunction will cause GT Wilmington harm by "changing its position by allowing Plaintiff to enter the Port," GT Wilmington does not provide an explanation of what specific harm, if any, it will suffer if Plaintiff is permitted to enter the Port.  GT Wilmington's Resp. at 11–12.  GT Wilmington also does not explain how Plaintiff's potential employment with other employers at the Port will harm GT Wilmington's business at the Port.  Without a preliminary injunction enjoining GT Wilmington from barring Plaintiff's entry to the Port, Plaintiff will continue to suffer the irreparable

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 43 of 70 PageID #: 213

Consol. C.A. No. 22-01192                                    Page 43

harm of being barred from employment opportunities at the Port that cannot be replicated elsewhere.

The Court holds that the balance of hardships weighs in favor of granting a preliminary injunction enjoining GT Wilmington from permanently banning Plaintiff from the Port and barring him from securing future employment there.

### D.    Public Interest

The public interest in granting a preliminary injunction in an employment context is "in employers being free to hire whom they please and employees being free to work for whom they please." Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir. 2010).

GT Wilmington argues that it would not be in the public's interest to grant a preliminary injunction because the preliminary injunction will change GT Wilmington's position with respect to allowing Plaintiff entry to the Port.  GT Wilmington's Resp. at 11–12.  Plaintiff argues that the preliminary injunction is in the public's interest because GT Wilmington will not suffer harm or loss from Plaintiff's access to the Port.  Pl.'s Br. at 19.

Plaintiff's access the Port to secure employment with other employers does not limit GT Wilmington's hiring practices or hinder its right to employ whomever it chooses.  Thus, the Court holds that the public interest weighs in favor of

granting a preliminary injunction lifting GT Wilmington's ban of Plaintiff from the Port and allowing Plaintiff to secure future employment there.

Because Plaintiff has satisfied all four factors, the Court grants Plaintiff's Motion for preliminary injunctive relief and prohibits GT Wilmington from banning Plaintiff's entry to the Port and prohibits GT Wilmington from interfering with Plaintiff's future employment. The Court denies Plaintiff's Motion for preliminary injunctive relief with respect to requiring GT Wilmington to reserve $750,000 for a future judgment in favor of Plaintiff.

### III. Motion to Dismiss Wrongful Expulsion from Union (C.A. No. 22-01192)

#### A. Ashe as a Party

The Union Defendants argue that in an action arising under Section 301 of the LMRA, "the law is clear that individual union officers are not personally liable to third parties for actions taken on behalf of the union in the collective bargaining process.'" C.A. No. 22-01192, Union Defs.' Br. at 8; see also C.A. No. 23-00968, Union Defs.' Br. at 16.

Under 29 U.S.C. § 185, "[a]ny labor organization . . . shall be bound by the acts of its agents. . . . Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 45 of 70 PageID #: 215

Consol. C.A. No. 22-01192                                         Page 45

as an entity and against its assets, and shall not be enforceable against any individual member or his assets." 29 U.S.C. § 185(b).

Plaintiff seeks compensatory and punitive damages as well as costs and attorneys' fees against the Union Defendants, including Ashe. However, 29 U.S.C. § 185(b) provides that monetary damages against a labor organization are not enforceable against an individual member. Although Plaintiff argues that Ashe's actions were outside of the collective bargaining process, Ashe's alleged actions of wrongfully expelling Plaintiff from the union and allegedly violating Plaintiff's rights under the Merger Agreement and the union's bylaws were in his capacity as an agent of Local 1694. See C.A. No. 22-01192, Pl.'s Resp. at 20–21. Therefore, pursuant to 29 U.S.C. § 185(b), Ashe's actions bind Local 1694, which is the appropriate party for Plaintiff to sue and recover damages from.

Accordingly, the Court holds that Ashe is not a proper party to Plaintiff's suit against Local 1694.

## B.    Count I: LMRA Claim

Count I alleges that Local 1694 violated Section 101(a)(5) of the LMRA, as provided in 29 U.S.C. § 411, when Local 1694 wrongfully rejected Plaintiff's tender of dues. C.A. No. 22-01192, Am. Compl. ¶¶ 34–37.

Local 1694 moves to dismiss Count I on the grounds that Plaintiff has not pled facts to support his claim that he was expelled from the union because Plaintiff was not eligible for membership in Local 1694.

29 U.S.C. § 411 states that:

> [n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).

Local 1694 argues that at the time that the merger of the unions occurred, Plaintiff was no longer an employee at the Port and that his tender of dues was rejected because he was no longer employed in a craft or trade within Local 1694's jurisdiction. C.A. No. 22-01192, Union Defs.' Mot. Br. at 4.

Plaintiff counters that Local 1694 is estopped from claiming that Plaintiff did not qualify for membership because it accepted him as a member upon the dissolution of Local 1694-1 in March 2021, well after Plaintiff's employment with GT Wilmington had ended and he had already been permanently banned from entry to the Port. Pl.'s Resp. at 9. Plaintiff asserts that Local 1694's claim that Plaintiff was not qualified to be a member of Local 1694 is based on a misreading of the union's bylaws because the membership provision, Article IV of the bylaws, addresses the initial application and the loss of membership status. Id. at 10.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 47 of 70 PageID #: 217

Consol. C.A. No. 22-01192                                                    Page 47

Plaintiff argues that Article IV(a) establishes that one is eligible to be a member if he is an actual or potential employee in a craft or trade within Local 1694's jurisdiction and Article IV(b) states that a member loses his status "either for failure to pay dues and assessments, or after appropriate proceedings."  Id.

In his Amended Complaint, Plaintiff claims that when Local 1694-1 was dissolved, its members were absorbed by three ILA unions based on their job classifications, and the terms of the Merger Agreement stated that "members of Local 1694-1 who were in good standing as of the date of the merger shall be members in good standing of Local 1694."  C.A. No. 22-01192, Am. Compl. ¶ 8. The Amended Complaint alleges that Local 1694 "agreed to honor existing contractual arrangements and assume 'all collective bargaining duties and responsibilities' undertaken by Local 1694-1."  Id. ¶ 25.  Plaintiff asserts that Local 1694 accepted Plaintiff as a member based on his former membership in Local 1694-1, and that at the time that Local 1694 was established, Local 1694-1 was representing Plaintiff in his grievance challenging GT Wilmington's termination of Plaintiff's employment.  Id. ¶¶ 9–10, 23–24.  Plaintiff claims that Local 1694 withdrew the grievance that Local 1694-1 had taken to arbitration, and that when Local 1694 made the decision to withdraw the grievance, it justified that decision on the grounds that Plaintiff had been implicated in a theft, but never raised the issue that Plaintiff was not qualified to be a member of Local 1694.  Id. ¶¶ 26–28.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 48 of 70 PageID #: 218

Consol. C.A. No. 22-01192                                                    Page 48

The Amended Complaint alleges that it was not until March 2022, one year after

Plaintiff became a member of Local 1694, that Local 1694 rejected his tender of

dues on the grounds that he was no longer employed in a craft or trade within

Local 1694's jurisdiction, that he was not eligible for membership because he was

permanently banned from the Port and, therefore, was unable to seek work within

Local 1694's jurisdiction.  Id. ¶¶ 29–31.

These allegations, accepted as true and drawing all reasonable inferences in

favor of the Plaintiff as the non-movant, support a plausible inference that Plaintiff

was a member of Local 1694, and that Local 1694 violated Section 101(a)(5) of the

LMRA, as provided in 29 U.S.C. § 411, by wrongfully expelling Plaintiff from

membership.  Although Local 1694 argues that Plaintiff was no longer employed

in a profession within its jurisdiction by the time that Local 1694 was formed, the

allegations support a plausible inference that Plaintiff was a member in good

standing of Local 1694-1 to whom Local 1694 owed the responsibility of handling

Plaintiff's grievance that was already scheduled for arbitration before the

dissolution of Local 1694-1.  Plaintiff's allegations support an inference that

Plaintiff was accepted as a member of Local 1694 by virtue of him being a member

of Local 1694-1 in good standing and whose expulsion could only be justified if

Plaintiff had failed to pay his dues.  The Amended Complaint alleges that Plaintiff

attempted to tender his dues once in December 2021 and twice in March 2022, but

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 49 of 70 PageID #: 219

Consol. C.A. No. 22-01192                                    Page 49

Local 1694 did not accept the tender of the dues.  Id. ¶¶ 15, 29.  The rejection of

Plaintiff's tender of dues is not the same as failure to pay dues such that he can be

subjected to expulsion.

Accordingly, Plaintiff has sufficiently pled wrongful expulsion.

## C.   Count II: Tortious Interference with Prospective Economic Advantage

In Count II, Plaintiff alleged that as a result of engaging in wrongful

expulsion from Local 1694, Local 1694 not only severely impugned and damaged

Plaintiff's reputation and standing, but also intentionally interfered with his

prospective economic advantage without legal justification.  C.A. No. 22-01192,

Am. Compl. ¶¶ 38–42.

Local 1694 moves to dismiss Count II because Local 1694 claims that

Section 301 of the LMRA preempts state law claims that substantially depend on

the analysis of a collective bargaining agreement, and that Plaintiff's claim is

preempted because Local 1694 was enforcing the language of Article IV of Local

1694's bylaws when it determined that Plaintiff was not eligible for membership.

C.A. No. 22-01192, Union Defs.' Br. at 5–6.  Local 1694 also argues that dismissal

is warranted because Count II is time-barred.  Id. at 5.

Section 301 of the LMRA provides federal courts with jurisdiction over

"[s]uits for violation of contracts between an employer and a labor organization

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 50 of 70 PageID #: 220

Consol. C.A. No. 22-01192                                          Page 50

representing employees in an industry affecting commerce."  29 U.S.C. § 185.

That section "not only provides the federal courts with jurisdiction over

controversies involving collective-bargaining agreements but also authorizes the

courts to fashion 'a body of federal law for the enforcement of these collective

bargaining agreements.'"  United Steelworkers of Am., AFL–CIO–CLC v.

Rawson, 495 U.S. 362, 368 (1990) (quoting Textile Workers v. Lincoln Mills of

Ala., 353 U.S. 448, 451 (1957)); see also Rutledge v. Int'l Longshoremen's Ass'n

AFL-CIO, 701 Fed. App'x 156, 160 (3d Cir. 2017).  Section 301(a) of the LMRA

also permits a union member to sue a labor organization for violating its

constitution or bylaws.  Wooddell v. Int'l Bhd. of Elec. Workers, Local 71, 502

U.S. 93, 94 (1991).

     "At the same time, the mere existence of a collective bargaining agreement

does not prevent an individual from bringing state law claims based on some

independent agreement or obligation."  Trans Penn Wax Corp. v. McCandless, 50

F.3d 217, 229 (3d Cir. 1995).  "[A] state-law claim may depend for its resolution

upon both the interpretation of a collective-bargaining agreement and a separate

state-law analysis that does not turn on the agreement.  In such a case, federal law

would govern the interpretation of the agreement, but the separate state-law

analysis would not be pre-empted."  Lingle v. Norge Div. of Magic Chef, Inc., 486

U.S. 399, 413 n.12 (1988).  "[N]ot every dispute concerning employment, or

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 51 of 70 PageID #: 221

Consol. C.A. No. 22-01192                                         Page 51

tangentially involving a provision of a collective-bargaining agreement, is pre-empted by [Section] 301 or other provisions of the federal labor law." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985); see Rutledge, 701 Fed. App'x at 161.

Local 1694 argues that the decision to not renew Plaintiff's membership is based on the fact that Local 1694 was enforcing Article IV of its bylaws, which does not allow membership to persons who are not employed in a craft within their jurisdiction. C.A. No. 22-01192, Union Defs.' Br. at 5–6.

Plaintiff's claim for tortious interference with a prospective economic advantage is based on the wrongful expulsion from Local 1694, which Plaintiff claims was in violation of Section 101(a)(5) of the LMRA, 29 U.S.C. § 411(a)(5). Although Section 301 of the LMRA permits a party to sue a union for violation of its constitution and bylaws, Plaintiff's claim regarding tortious interference with prospective economic advantage is based on wrongful expulsion in violation of Section 101(a)(5) of the LMRA, not a collective bargaining agreement or union bylaws that are subject to Section 301 of the LMRA. Plaintiff's state tort claim is not pre-empted, therefore, by Section 301 of the LMRA and is not subject to the six-month statute of limitations for a duty of fair representation claim, as Local 1694 asserts. Rather, Plaintiff's tortious interference with a prospective economic

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 52 of 70 PageID #: 222

Consol. C.A. No. 22-01192                                                    Page 52

advantage is subject to a three-year statute of limitations under Delaware law.  Del. Code Ann. tit. 10 § 8106.  Thus, Plaintiff's claim is not time-barred.

In Delaware, to establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference that induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.  Enzo Life Scis., 295 F. Supp. 2d at 429 (citing Lucent Info. Mgmt., 5 F. Supp. 2d at 243).

Plaintiff claims that he had a valid business expectancy of continued employment because of his thirty-five years of employment at the Port.  Plaintiff argues that Local 1694 knew, or should have known, of the existence of Plaintiff's valid business expectancy.  C.A. No. 22-01192, Am. Compl. ¶¶ 38–42.  Plaintiff states that on March 28, 2022, Local 1694 wrongfully rejected Plaintiff's tender of dues, and that he was unable to secure gainful employment at the Port as a result of the wrongful expulsion from Local 1694.  Id. ¶ 36–37, 41.  Plaintiff claims that he suffered significant financial losses as a direct and proximate consequence of Local 1694's conduct of wrongful expulsion.  Id. ¶ 42.

Accepting these allegations as true and drawing all reasonable inferences in favor of the non-movant, Plaintiff has established that it can be plausibly inferred

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 53 of 70 PageID #: 223

Consol. C.A. No. 22-01192                                                  Page 53

that Plaintiff had a valid business expectancy because of the length of his work experience at the Port and that Local 1694 knew or should have known of Plaintiff's valid business expectancy as a result of his membership in Local 1694. It can also be plausibly inferred that as a result of Local 1694's wrongful expulsion of Plaintiff from the union, Local 1694 interfered with Plaintiff's valid business expectancy because he was unable to secure gainful employment at the Port in a craft that was within the jurisdiction of Local 1694, which resulted in Plaintiff suffering monetary loss.

Therefore, at this stage of litigation, Plaintiff has sufficiently pled that Local 1694 tortiously interfered with his prospective economic advantage.

### D.    Counts III, IV, and V: Breach of Contract and Violation of Bylaws

In Count III, Plaintiff claims that Local 1694 breached the Merger Agreement in violation of Section 301 of the LMRA when Local 1694 failed to honor commitments taken by Local 1694-1 before the merger, including the commitment to take Plaintiff's grievance to arbitration.  C.A. No. 22-01192, Am. Compl. ¶¶ 43–47.  In Count IV, Plaintiff alleges that the same conduct constituted a breach of contract under common law.  Id. ¶¶ 48–49.  In Count V, Plaintiff alleges that Local 1694 breached its contractual obligation under Local 1694's bylaws when Local 1694 did not respond to or acknowledge Plaintiff's two

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 54 of 70 PageID #: 224

Consol. C.A. No. 22-01192                                               Page 54

requests for a membership review of the Executive Board's decision to withdraw Plaintiff's grievance from arbitration.  Id. ¶¶ 50–54.

Local 1694 moves to dismiss Counts III–V and argues that Plaintiff's breach of contract claims are essentially claims that Local 1694 breached its duty of fair representation.  Local 1694 asserts that the claims are time-barred because Section 301 of the LMRA requires an individual to bring a claim against a union's breach of the duty of fair representation within six months of the breach.  C.A. No. 22-01192, Union Defs.' Br. at 6–7.  Local 1694 also contends that Count V of Plaintiff's Amended Complaint is time-barred because Plaintiff did not file it within six months of Local 1694's alleged breach of the bylaws.  Id.  Local 1694 asserts that Plaintiff's claim in Count V must fail because the courts should not substitute a union's interpretation of its own bylaws with the courts' interpretations.  Id. at 7 (citing Local 334, United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Canada v. United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U.S. & Canada, AFL-CIO, 669 F.2d 129, 131 (3d Cir. 1982)).

Plaintiff argues that Local 1694 improperly recharacterized Plaintiff's breach of contract claims as breach of the duty of fair representation claims, even though Plaintiff does not make such a claim in his Amended Complaint.  Pl.'s

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 55 of 70 PageID #: 225

Consol. C.A. No. 22-01192                                    Page 55

Resp. at 18.  Plaintiff contends that his claims in Counts III–V are unrelated to the

collective bargaining process.  Id.

      In the Amended Complaint, Plaintiff claims that Local 1694 had a

contractual obligation under the Merger Agreement to represent him in his

grievance challenging GT Wilmington's wrongful discharge of Plaintiff.  C.A. No.

22-01192, Am. Compl. ¶¶ 43–47.  Plaintiff asserts that the Amended Complaint

does not allege a claim of breach of the duty of fair representation and argues that

the Court should analyze Plaintiff's claims based on the state law regarding breach

of contract, as alleged in the Amended Complaint.  Id. ¶¶ 43–47.

      To establish a breach of contract, a plaintiff must prove by a preponderance

of the evidence: (i) the existence of the contract, (ii) breach of an obligation

imposed by that contract, and (iii) resultant damage to the plaintiff.  Air Prods. &

Chems., Inc. v. Wiesemann, 237 F. Supp. 3d 192, 213 (D. Del. 2017) (quoting

VLIW Tech., LLC v. Hewlett–Packard Co., 840 A.2d 606, 612 (Del. 2003)).

Section 301(a) of the LMRA permits a union member to sue a labor organization

for violating its constitution or bylaws.  Wooddell, 502 U.S. at 94.

      Plaintiff's Amended Complaint contends that the Merger Agreement

constitutes a contract between labor organizations, which is enforceable by

individual union members under Section 301.  CA No. 22-01192, Am. Compl.

¶ 44.  Plaintiff asserts that he was a third-party beneficiary of the Merger

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 56 of 70 PageID #: 226

Consol. C.A. No. 22-01192                                                    Page 56

Agreement, which required Local 1694 to honor commitments undertaken by Local 1694-1 before the merger, including the commitment to take Plaintiff's grievance to arbitration.  Id. ¶¶ 24–25, 46.  Plaintiff also alleges that very shortly after the effective date of the Merger Agreement, March 11, 2021, Local 1694 violated its terms by withdrawing Plaintiff's discharge grievance from arbitration. Id. ¶ 47.  Because of Local 1694's withdrawal of his discharge grievance, Plaintiff contends that Local 1694 breached its contractual obligation, which included the commitment to take Plaintiff's discharge grievance to arbitration, and also violated Local 1694's bylaws by refusing to respond to Plaintiff's two requests for a membership review of the decision to withdraw Plaintiff's grievance from arbitration.  Id. ¶¶ 53, 54.

These allegations, accepted as true and drawing all reasonable inferences in favor of Plaintiff as the non-movant, establish a plausible inference that a contract existed to which Plaintiff was owed an obligation by Local 1694 as a third-party beneficiary and a member, and that Local 1694 had the obligation to honor the commitments and responsibilities that Local 1694-1 had towards Plaintiff, especially with regard to Plaintiff's grievance.  Plaintiff's allegations also support an inference that Local 1694 breached this obligation when Local 1694 withdrew Plaintiff's grievance shortly after entering into the Merger Agreement and refused to give Plaintiff an opportunity to appeal the withdrawal of the grievance.

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 57 of 70 PageID #: 227

Consol. C.A. No. 22-01192                                              Page 57

Accordingly, Plaintiff has sufficiently pled his breach of contract claims

against Local 1694.

### E.    Count VI: Free Speech Rights in Violation of 29 U.S.C. § 411(a)(2)

Count VI alleges a violation of Plaintiff's free speech rights in violation of

29 U.S.C. § 411(a)(2).  C.A. No. 22-01192, Am. Compl. ¶¶ 55–59.  Local 1694

moves to dismiss Count VI, arguing that Plaintiff was not wrongfully expelled

from Local 1694.  C.A. No. 22-01192, Union Defs.' Br. at 7.

Under 29 U.S.C. § 411(a)(2):

> Every member of any labor organization shall have the right to meet
> and assemble freely with other members; and to express any views,
> arguments, or opinions; and to express at meetings of the labor
> organization his views, upon candidates in an election of the labor
> organization or upon any business properly before the meeting, subject
> to the organization's established and reasonable rules pertaining to the
> conduct of meetings: *Provided* [t]hat nothing herein shall be construed
> to impair the right of a labor organization to adopt and enforce
> reasonable rules as to the responsibility of every member toward the
> organization as an institution and to his refraining from conduct that
> would interfere with its performance of its legal or contractual
> obligations.

29 U.S.C. § 411 (a)(2) (emphasis in original).  The Third Circuit has articulated a

general rule that under the LMRA, "the members' right of free speech is given an

expansive protection."  Mallick v. Int'l Bhd. of Elec. Workers, 644 F.2d 228, 235

(3d Cir. 1981).

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 58 of 70 PageID #: 228

Consol. C.A. No. 22-01192                                                    Page 58

Plaintiff contends that on December 23, 2021, March 11, 2022, and March 28, 2022, he tendered dues to Local 1694 and that Ashe informed Plaintiff of Local 1694's rejection of his tender of dues on the grounds that Plaintiff was no longer employed in a craft or trade within the jurisdiction of Local 1694.  C.A. No. 22-01192, Compl. ¶¶ 15, 29–33, 58.  Plaintiff further asserts that Local 1694 claimed that Plaintiff was not eligible for membership because he was "barred from the Port" and therefore unable to seek work within the jurisdiction of Local 1694.  Id. ¶¶ 36, 58.  Plaintiff argues that he fully exhausted internal union remedies in a futile effort to reverse Local 1694's decisions to withdraw his grievance from arbitration and to deny him membership status.  Id. ¶¶ 36, 58.  Plaintiff alleges that by wrongfully expelling him from Local 1694, rejecting the tender of his dues, and refusing to allow Plaintiff to appeal the withdrawal of his grievance from arbitration, Local 1694 violated Plaintiff's free speech.  Id. ¶ 58.

These allegations, taken as true and viewed in the light most favorable to Plaintiff as the non-moving party, support a plausible inference that Plaintiff, as a member of Local 1694, was denied his right of free speech as a result of being wrongfully expelled from the union and therefore was unable to express his views and opinions at meetings.  Furthermore, Plaintiff's allegation of wrongful expulsion from Local 1694 supports a plausible inference that his right to free

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 59 of 70 PageID #: 229

Consol. C.A. No. 22-01192                                                    Page 59

speech was violated with respect to his appeal of the union's decision to withdraw his grievance from arbitration.

Therefore, Plaintiff has sufficiently pled a violation of his right to free speech.

## IV.   Motion to Dismiss Racial Discrimination Complaint (C.A. No. 23-00968)

Plaintiff asserts one count of disparate treatment based upon race and one count of hostile work environment against Local 1694.  C.A. No. 23-00968, Compl. ¶¶ 53–68.

Local 1694 moves to dismiss Count I on the grounds that Plaintiff fails to plead facts showing that Local 1694 acted with discriminatory animus or permitting an inference of discrimination.  C.A. No. 23-00968, Union Defs.' Br. at 4–13.

### A.   Racial Discrimination

Plaintiff's Complaint alleges that Local 1694 willfully, intentionally, and unlawfully violated 42 U.S.C. § 2000e-2 when the union: (1) withdrew Plaintiff's grievance from arbitration and elected not to reinstate the grievance knowing that withdrawal would cause Plaintiff to lose his job and, likely, his ability to work at the Port; (2) colluded with GT Wilmington to rehire African American workers when GT Wilmington had a job shortage rather than Plaintiff, despite his lengthy

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 60 of 70 PageID #: 230

Consol. C.A. No. 22-01192                                                    Page 60

seniority; (3) expelled Plaintiff from Labor 1694; and (4) refused to take steps

necessary for Plaintiff to get paid for his work with DRS.  C.A. No. 23-00968,

Compl. ¶¶ 53–59.

> Under 42 U.S.C. § 2000e-2(c), it is unlawful for a labor union to:
>
> (1)  exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
>
> (2)  to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (3)  to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

42 U.S.C. § 2000e-2(c).  "To establish a *prima facie* Title VII claim against a

union, a plaintiff must show . . . that 'there was some indication that the union's

actions were motivated by discriminatory animus.'"  Young v. Local 1201 Firemen

& Oilers Union, 419 Fed. App'x 235, 240–41 (3d Cir. 2011) (quoting York v. Am.

Tel. & Tel. Co., 95 F.3d 948, 955–56 (10th Cir. 1996)).  Plaintiffs bringing Title

VII claims commonly plead a reasonable inference of discrimination by raising

allegations that "similarly situated persons not within the protected class," known

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 61 of 70 PageID #: 231

Consol. C.A. No. 22-01192                                                    Page 61

as comparators, "were treated more favorably." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 n.7 (3d Cir. 2003).

While a plaintiff's comparators need not be "identically situated" to the plaintiff, they "must nevertheless be similar in all relevant respects." Opsatnik v. Norfolk S. Corp., 335 Fed. App'x 220, 222–23 (3d Cir. 2009) (citation omitted). Thus, when a plaintiff alleges workplace discrimination, relevant factors for determining whether a plaintiff is similarly situated to his alleged comparators include, but are not limited to, "whether the comparators '(1) had the same job description, (2) were subject to the same standards, (3) were subject to the same supervisor, and (4) had comparable experience, education, and other qualifications.'" Taylor-Bray v. Delaware Dep't of Servs. for Child, Youth & their Fams., 627 Fed. App'x 79, 83 (3d Cir. 2015) (citing Salas v. Wisconsin Dep't of Corrections, 493 F.3d 913, 923 (7th Cir. 2007)).

Plaintiff asserts that, as a Caucasian man who was qualified to work at the Port, he was a minority in Local 1694 because Local 1694's membership is, or was at all relevant times, approximately 90% to 95% African American. C.A. No. 23-00968, Compl. ¶ 55. Plaintiff claims that Local 1694 and Ashe, an African American male who, at all relevant times, was the President of Local 1694, directly and proximately caused Plaintiff to suffer the following adverse employment actions: (1) loss of Plaintiff's opportunity to contest his suspension and termination

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 62 of 70 PageID #: 232

Consol. C.A. No. 22-01192                                                Page 62

of employment by GT Wilmington through Local 1694 as a result of Local 1694's decision to withdraw his grievance from arbitration; (2) Plaintiff's loss of prospective employment opportunities at the Port as a result of the withdrawal of Plaintiff's grievance; (3) loss of a rehiring opportunity with GT Wilmington as a result of Local 1694's and Ashe's collusion with GT Wilmington to rehire only African American workers when GT Wilmington had a job shortage; (4) Plaintiff's loss of his job at the Port with DRS; (5) wrongful expulsion from Local 1694; and (6) Plaintiff's loss of wages from DRS as a result of Local 1694 withholding payment of wages from Plaintiff.  Id. ¶¶ 55–56.

Plaintiff further asserts that in addition to Local 1694's membership largely consisting of African American employees, Ashe once made a comment that the union would "play the race card to get what they want" in the context of obtaining insurance for Local 1694's members, but that Plaintiff understood that statement to mean that Ashe and Local 1694 would "play the race card" in any situation to get what they want.  Id. ¶ 47.  Plaintiff also argues that Local 1694, "upon information and belief, to counterbalance whatever adverse action befell Miller, [Local 1694] and/or Ashe intervened with GT Wilmington to punish [Plaintiff], who [is Caucasian] . . . equally with Miller."  Id. ¶ 50.  Plaintiff contends that his race was the reason or the motivation behind why he suffered adverse employment actions and that as a result of Local 1694's racial discrimination, Plaintiff suffered loss of

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 63 of 70 PageID #: 233

Consol. C.A. No. 22-01192                                                    Page 63

income, financial stress, extreme emotional distress, and loss of enjoyment of and disruption to life.  Id. ¶ 57.

The Court holds that these allegations, accepted as true and viewed in the light most favorable to Plaintiff as the non-movant, support a plausible inference that Local 1694's actions were motivated by discriminatory animus.  Plaintiff's assertion that Local 1694, a union whose membership is approximately 90% to 95% African American, was involved in GT Wilmington's decision to reinstate only African American employees regardless of their seniority and experience supports an inference that Local 1694 caused GT Wilmington to discriminate against Plaintiff based on his race, in violation of 42 U.S.C. § 2000e-2(c)(3).  The allegations that Local 1694 withdrew Plaintiff's grievance from arbitration, refused to reinstate the grievance, and wrongfully expelled Plaintiff from Local 1694 support an inference that Local 1694's actions resulted in Plaintiff being deprived of employment opportunities at the Port, in violation of 42 U.S.C. § 2000e-2(c)(2).

Accordingly, the Court holds that at this stage of the proceedings, Plaintiff has sufficiently pled a racial discrimination claim.

## B.    Hostile Work Environment

Plaintiff alleges that Local 1694 willfully, intentionally, and unlawfully violated the laws and regulations of the United States, including 42 U.S.C. § 2000e

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 64 of 70 PageID #: 234

Consol. C.A. No. 22-01192                                                    Page 64

and 42 U.S.C. § 1981, and the laws and regulations of Delaware, including 19 Del.

C. § 710.  C.A. No. 23-00968, Compl. ¶¶ 60–68.

Local 1694 moves to dismiss Count II on the grounds that Plaintiff fails to

allege any facts to support a claim that he was subjected to a hostile work

environment at GT Wilmington.  C.A. No. 23-00968, Union Defs.' Br. at 13–15.

To recover against a union under a hostile work environment theory, a

plaintiff must show that: (1) he was subjected to a hostile work environment; (2) he

requested action on the part of the union; and (3) the union ignored his request for

action.  Durko v. OI-NEG TV Prods., Inc., 870 F. Supp. 1268 (M.D. Pa. 1994),

aff'd, 103 F.3d 112 (3d Cir. 1996).  To establish that a plaintiff was subjected to a

hostile work environment claim under Title VII, he must demonstrate that: (1) he

suffered intentional discrimination because of his race; (2) the discrimination was

severe or pervasive, (3) the discrimination detrimentally affected the plaintiff,

(4) the discrimination would detrimentally affect a reasonable person in like

circumstances, and (5) there was respondeat superior liability.  Mandel v. M & Q

Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).  Isolated incidents can amount

to harassment if they are extremely serious.  See Castleberry v. STI Grp., 863 F.3d

259, 265 (3d Cir. 2017) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788

(1998)).  A plaintiff does not need to prove each element of the hostile work

environment claim to survive a motion to dismiss, but must state facts that are

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 65 of 70 PageID #: 235

Consol. C.A. No. 22-01192                                              Page 65

enough to raise a reasonable expectation that the necessary elements will be revealed through discovery.  Connelly v. Lane Const. Corp., 809 F.3d 780, 789 (3d Cir. 2016).

Local 1694 argues that Plaintiff failed to allege any facts to support a claim that he was subjected to a hostile work environment at GT Wilmington or in any work environment.  C.A. No. 23-00968, Union Defs.' Br. at 13–15.  Local 1694 asserts that the only facts in the Complaint that are alleged to have occurred prior to Plaintiff's termination are his recital of the events on November 10, 2020, which led to his termination, but that Plaintiff does not allege that he was subject to any discriminatory conduct prior to his termination from GT Wilmington that was severe or pervasive.  Id. at 14.  Local 1694 also contends that Plaintiff's termination alone does not support a claim of hostile work environment because termination is a discrete act and not a component of a hostile work environment claim.  Id.

Plaintiff alleges that he was subjected to intentional harassment by Local 1694 because of his race, including: (1) failure to pursue Plaintiff's grievance regarding his suspension and termination; (2) intervening to prevent Plaintiff from serving as an officer of Local 1694; (3) denial of Plaintiff's membership/expulsion from membership in Local 1694; (4) refusing Plaintiff the ability to participate in Local 1694's business meetings or have votes taken by the membership on his

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 66 of 70 PageID #: 236

Consol. C.A. No. 22-01192                                                    Page 66

issues; (5) failure to cooperate to get Plaintiff paid for his work with DRS; and

(6) failure to effectively and/or consistently communicate with Plaintiff regarding

issues with his employment.  C.A. No. 23-00968, Compl. ¶¶ 60–62.  Plaintiff

claims that these acts constitute conduct that was part of a practice that stretched

from at least November 2020 through March 2022, constituted severe or pervasive

harassment, and would detrimentally affect a reasonable person and did, in fact

detrimentally affect Plaintiff.  Id. ¶ 63.  Plaintiff asserts that "upon information and

belief, an unknown individual or individual(s) in management at Local 1694, likely

Ashe, directed this harassment against Plaintiff."  Id. ¶ 66.  Plaintiff alleges that

Local 1694 was aware or should have been aware that harassment was occurring

and that as a result of the discrimination based upon Plaintiff's race, Plaintiff

suffered loss of income, financial stress, extreme emotional distress, and loss of

enjoyment of and disruption to life.  Id. ¶¶ 52, 67.

These allegations, accepted as true and viewed in the light most favorable to

Plaintiff as the non-movant, support a reasonable inference that Local 1694

subjected Plaintiff, who was in the racial minority of Local 1694's membership, to

a hostile work environment based on his race.  It can be reasonably inferred that

Local 1694 ignored Plaintiff's request for action against a hostile work

environment at GT Wilmington from Plaintiff's assertions that Local 1694 failed to

pursue Plaintiff's grievance regarding his suspension and termination from GT

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 67 of 70 PageID #: 237

Consol. C.A. No. 22-01192                                                Page 67

Wilmington.  Plaintiff's assertion that Local 1694 refused to reinstate the grievance

after Local 1694 withdrew the grievance from arbitration also supports a

reasonable inference that Local 1694 ignored Plaintiff's request for action.  The

severity and pervasiveness of the harassment can be deduced from Plaintiff's

contention that GT Wilmington's suspension and termination of Plaintiff's

employment was extreme in light of the way GT Wilmington treated African

American employees who were similarly situated.  See id. ¶ 49.

At this stage of the proceedings, Plaintiff has sufficiently pled a racial

discrimination claim against GT Wilmington from which it can be deduced that

Plaintiff was subjected to a hostile work environment by GT Wilmington.  See

C.A. No. 22-01441, Am. Compl. ¶¶ 65–72.  Although Local 1694 contends that

termination is a discrete act that is separate from a hostile work environment claim,

Plaintiff's allegations show that the grievance against GT Wilmington was not

limited to the termination, but also encompassed Plaintiff's suspension.  See C.A.

No. 23-00968, Compl. ¶ 62.  Because Plaintiff requested action from Local 1694 to

take his grievance to arbitration and Local 1694 allegedly failed to do so, it can be

inferred that Local 1694 ignored Plaintiff's request, thereby subjecting Plaintiff to

a hostile work environment.

Accordingly, Plaintiff's Count II has sufficiently pled a claim for hostile

work environment against Local 1694.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Plaintiff's Motion for Preliminary Injunction in Civil Action No. 22-01441.  The Court orders that GT Wilmington shall not ban Plaintiff from entering the Port of Wilmington.  The Court also orders that GT Wilmington shall not interfere with or prevent Plaintiff from securing future employment at the Port of Wilmington.  The Court denies Plaintiff's Motion for preliminary injunctive relief with respect to requiring GT Wilmington to reserve $750,000 for a future potential judgment.

The Court denies in part and grants in part GT Wilmington's Motion to Dismiss Plaintiff's Amended Complaint in Civil Action No. 22-01441.  The Court grants GT Wilmington's Motion to Dismiss the claims of compelled self-defamation (Count IV) and Fourth Amendment malicious prosecution (Count VII), but denies GT Wilmington's motion to dismiss the claims of discharge without just cause in violation of the collective bargaining agreement (Count I); malicious prosecution (Count II); intentional infliction of emotional distress (Count III); tortious interference with prospective economic advantage (Count VI); and racial discrimination in violation of 42 U.S.C. § 1981 (Count V).

The Court denies the Union Defendants' Motion to Dismiss Plaintiff's Amended Complaint in Consolidated Civil Action No. 22-01192 against Defendants for wrongful expulsion.  The Court denies the motion to dismiss the

Case 1:22-cv-01192-JCG   Document 29   Filed 06/24/24   Page 69 of 70 PageID #: 239

Consol. C.A. No. 22-01192                                          Page 69

claims of wrongful expulsion from the union (Count I); tortious interference with prospective economic advantage (Count II); breach of Merger Agreement in violation of 29 U.S.C. § 185 (Count III); breach of Merger Agreement in violation of common law (Count IV); violation of Local 1694's bylaws (Count V); and violation of free speech rights (Count VI).

The Court denies the Union Defendants' Motion to Dismiss Plaintiff's Complaint in Civil Action No. 23-00968 regarding the claims of disparate treatment based upon race (Count I) and hostile work environment (Count II).

ACCORDINGLY, IT IS HEREBY

**ORDERED** that Plaintiff's Motion for Preliminary Injunction, Civil Action No. 22-01441 (D.I. 6), is granted in part and denied in part; and it is further

**ORDERED** that GT Wilmington's Motion to Dismiss, Civil Action No. 22-01441 (D.I. 14), is denied in part and granted in part; and it is further

**ORDERED** that the Union Defendants' Motion to Dismiss, Consolidated Civil Action No. 22-01192 (D.I. 12), is denied; and it is further

**ORDERED** that the Union Defendants' Motion to Dismiss, Civil Action No. 23-00968 (D.I. 6), is denied; and it is further

**ORDERED** that Defendants shall file their respective Answers to Plaintiff's remaining claims on or before July 8, 2024; and it is further

**ORDERED** that the Court will hold a Federal Rule of Civil Procedure 16(b)

scheduling conference at the United States District Court for the District of

Delaware on Friday, June 28, 2024 at 1:00p.m. in Courtroom 2A.

IT IS SO ORDERED this 24th day of June, 2024.


/s/ Jennifer Choe-Groves
Jennifer Choe-Groves
U.S. District Court Judge*

---

* Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.