# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **DONALD R. ZIMMERMAN, SR.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**INTERNATIONAL LONGSHOREMAN'S ASSOCIATION, LOCAL 1694, WILLIAM ASHE, JOHN DOE 1 THROUGH 10, AND INTERNATIONAL LONGSHOREMAN'S ASSOCIATION, LOCAL 2076,**<br><br>**Defendants.** | **Consol. Court No. 1:22-cv-01192-JCG** |

## OPINION AND ORDER

[Granting in part and denying in part Defendants' Motion for Summary Judgment and denying Plaintiff's Motion for Partial Summary Judgment.]

Dated: March 30, 2026

Patrick C. Gallagher, Jacobs & Crumplar, P.A., of New Castle, DE, and Steven C. Kahn, Law Offices of Steven C. Kahn, of New Castle, DE.  Attorneys for Plaintiff Donald R. Zimmerman, Sr.

Lance M. Geren and Patrick K. Martin, O'Donoghue & O'Donoghue, LLP, of New Castle, DE.  Attorneys for Defendants International Longshoreman's Association, Local 1694 and William Ashe.

Keri L. Morris-Johnston, Keri L. Morris-Johnston, Esq., of Wilmington, DE. Attorney for John Doe 1 Through 10.

Consol. Court No. 1:22-cv-01192                                    Page 2

Choe-Groves, Judge: This matter involves a motion for summary judgment

and a cross-motion for partial summary judgment in an action brought by Donald

R. Zimmerman, Sr. ("Zimmerman" or "Plaintiff") against Defendant International

Longshoreman's Association, Local 1694 ("Local 1694")[1] for wrongful expulsion

from union membership and for denial of free speech rights under the Labor

Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C.

§§ 411(a)(2), (5), breach of contract in violation of the Labor Management

Reporting, Act ("LMRA"), 29 U.S.C. § 185(a), and tortious interference with

prospective economic advantage under Delaware common law.  Second Am.

Compl. Wrongful Expulsion Union Membership Denial Free Speech Right

("Second Am. Compl.") (D.I. 65).

Plaintiff initiated this lawsuit on September 9, 2022.  See Compl. Wrongful

Expulsion Union Membership (D.I. 1).  On July 29, 2025, Plaintiff filed a Second

Amended Complaint alleging the following causes of action: (1) wrongful

expulsion from union membership in violation of the LMRDA, 29 U.S.C.

§§ 411(a)(5) (Count I); (2) tortious interference with prospective economic

advantage (Count II); (3) breach of contract in violation of the LMRA, 29 U.S.C.

---

[1] Defendants International Longshoreman's Association, Local 1694, William Ashe, John Doe 1 Through 10, and International Longshoreman's Association, Local 2076 will hereafter be considered collectively as "Defendants" for purposes of the summary judgment motion.

Consol. Court No. 1:22-cv-01192                                    Page 3

§ 185(a) (Count III); (4) common law breach of contract (Count IV); (5) violation

of bylaws (Count V); (6) wrongful denial of free speech rights in violation of

LMRDA, 29 U.S.C. § 411(a)(2) (Count VI); (7) wrongful expulsion from union

membership in violation of LMRDA, 29 U.S.C. § 529 (Count VII); and (8)

violation of bylaws (Count VIII).  See Second Am. Compl.

Before the Court are Defendants'[2] Motion for Summary Judgment

("Defendants' Motion" or "Defendants' Motion for Summary Judgment")

(D.I. 106) and Plaintiff's Motion for Partial Summary Judgment on Liability

Against Defendants ("Plaintiff's Motion" or "Plaintiff's Motion for Partial

Summary Judgment") (D.I. 110).  See Opening Br. Supp. Defs.' Mot. Summ. J.

("Defs.' Br.") (D.I. 109); Pl.'s Opening Br. Supp. Mot. Part. Summ. J. Liability

Against Defs. ("Pl.'s Br.") (D.I. 111).  Plaintiff opposed Defendants' Motion for

Summary Judgment and Defendants opposed Plaintiff's Motion for Partial

Summary Judgment.  See Pl.'s Ans. Br. Opp'n Defs.' Mot. Summ. J. Supp. Mot.

Part. Summ. J. Liability ("Pl.'s Resp. Br.") (D.I. 121); Resp. Br. Opp'n Defs.' Mot.

Summ. J. Supp. Defs.' Mot. Summ. J. ("Defs.' Resp. Br.") (D.I. 119).  The Parties

filed their reply briefs.  See Pl.'s Reply Br. Supp. Mot. Part. Summ. J. Defs. ("Pl.'s

Reply Br.") (D.I. 123); Reply Br. Opp. Pl.'s Mot. Summ. J. Supp. Defs.' Mot.

---

[2] On February 28, 2026, the Court received notice that Defendants GT USA
Wilmington, LLC, Jerry Custis, and Enstructure Wilmington Holdings, LLC
reached a settlement agreement with Plaintiff.

Consol. Court No. 1:22-cv-01192                                        Page 4

Summ. J. ("Defs.' Reply Br.") (D.I. 122).  The Parties filed a Joint Statement of

Concise Undisputed Facts ("Statement Undisputed Facts") (D.I. 118).  The Court

held oral argument on the Parties' cross-motions for summary judgment on March

19, 2026.  See Order (Mar. 13, 2026) (D.I. 127).

For the following reasons, the Court grants Defendants' Motion for

Summary Judgment as to Count V, denies Defendants' Motion for Summary

Judgment as to Counts I, II, III, IV,[3] VI, VII, and VIII, and denies Plaintiff's

Motion for Partial Summary Judgment as to Counts I, V, and VIII.

## BACKGROUND

The Court finds that the following facts are undisputed:

The Port of Wilmington (the "Port") is a deep-water port located in

Wilmington, Delaware, and handles a variety of cargo including automobiles,

livestock, fresh fruit, petroleum, and steel.  Statement Undisputed Facts at ¶ 1.

Prior to October 2018, the Port was owned and operated by the Diamond State Port

Corporation ("Diamond State"), a corporation formed by the State of Delaware to

maintain and operate the Port.  Id. at ¶ 2.  GT USA Wilmington, LLC ("GT

Wilmington" or "GT") became the port operator for the Port on October 3, 2018,

pursuant to a Concession Agreement between GT Wilmington and Diamond State,

---

[3] Plaintiff stated that he "will voluntarily dismiss Count IV, which is duplicative of Count III."  Pl.'s Resp. Br. at 16 n.11.  Accordingly, the Court will treat Count IV of the Second Amended Complaint as voluntarily dismissed.

in which Diamond State leased all of its property at the Port to GT Wilmington, and GT Wilmington took over Diamond State's role at the Port.  Id. at ¶¶ 3–4.

Plaintiff was employed at the Port of Wilmington by Diamond State and GT Wilmington for more than 35 years as a forklift operator, crane operator, and gear man on the Port.  Id. at ¶ 5.  Many of the workers at the Port are members of various unions within the jurisdiction of the Port, but union membership is not a requirement of employment at the Port.  Id. at ¶ 6.  At the time of his termination, Plaintiff was a member of Local 1694-1, a labor organization chartered by and affiliated with the International Longshoreman's Association (the "ILA").  Id. at ¶¶ 7–8.  When GT Wilmington assumed control of the Port, it instituted a gasoline benefit permitting authorized employees to receive up to five gallons of gasoline daily when they used their personal vehicles at the Port.  Id. at ¶ 9.  GT's gasoline benefit had no written policy/rules, and only a handwritten cardboard sign indicated the five-gallon daily limit on gasoline for personal vehicles "unless authorized by management."  Id. at ¶ 10.  "Gear men," as the operators of the gasoline pumps, received a gas card and an access code in order to operate the gas pump, and when someone pulled up to the gasoline pump, the gear man was required to insert the card into the pump and then input the access code in order for the fuel to begin pumping.  Id. at ¶ 11.  GT did not expect gear men to verify claims by co-workers that they were authorized to pump gas unless the gear men

Consol. Court No. 1:22-cv-01192                                              Page 6

had reason for concern, and gear men typically verified an employee's eligibility verbally before dispensing fuel because there was no authorized personnel list.  Id. at ¶ 12–13.

Plaintiff was working as a gear man on November 10, 2020, and received instructions regarding his responsibilities as a gear man from his immediate supervisor, Mark Simpson.  Id. at ¶¶ 14–15.  Plaintiff did as his supervisor had instructed when Tim Miller ("Miller"), who worked as both a gear man and crane operator, pulled up to the fuel station in his personal vehicle on November 10, 2020.  Id. at ¶ 16.  At approximately 2:57 p.m.,[4] Miller inserted the card fob, activated the pump, and began fueling his maroon Jeep, which prompted Plaintiff to ask Miller whether he was authorized for fuel and Miller replied that he was authorized to receive gas.  Id. at ¶¶ 17, 19–20.  Miller ultimately pumped approximately 18.6 gallons.  Id. at ¶ 21.

On November 11, 2020, warehouse manager Michael Phillips ("Phillips") and maintenance director Andrew Corcoran ("Corcoran") summoned Plaintiff regarding a purported fuel audit.  Id. at ¶ 22.  Plaintiff's request for union representation was denied and management told Plaintiff that he was not under investigation.  Id.  Plaintiff denied dispensing fuel to unauthorized employees,

---

[4] There is some discrepancy with the exact time of when Miller pulled up to the gasoline pump.  The time stamp on the video surveillance shows 2:57 p.m., whereas the fuel log shows 3:07 p.m.  See Statement Undisputed Facts at ¶ 18.

Consol. Court No. 1:22-cv-01192                                          Page 7

noting the absence of an authorized personnel list.  Id.  Plaintiff was subsequently

suspended by GT pending investigation of whether Plaintiff had allowed the

"unauthorized distribution of fuel to individuals not entitled to receive the fuel."

Id. at ¶ 23.

On November 17, 2020, GT terminated Plaintiff for failure "to perform [his]

job duties by knowingly allowing the unauthorized distribution of fuel to

individuals not entitled to receive fuel."  Id. at ¶ 24.  GT fired Plaintiff based on the

information GT relied upon when they suspended Plaintiff a few days prior.  Id.

at ¶ 25.

The terms and conditions of Plaintiff's employment at the Port, including

rates of pay, wages, hours, seniority, and discipline, were governed by the

Collective Bargaining Agreement between Diamond State and Local 1694-1.  Id.

at ¶ 26.  The Collective Bargaining Agreement imposed a "just cause" limitation

upon GT's right to discharge employees.  Id. at ¶ 27.  Article 8 of the Collective

Bargaining Agreement established a four-step grievance procedure and arbitration

procedure.  Id. at ¶ 28.  Zimmerman filed a grievance through Local 1694-1

regarding his termination, which Local 1694-1 escalated directly to Level 3.  Id.

at ¶¶ 29–30.  If the grievance is not satisfactorily resolved after Level 3, the Union

may request arbitration.  Id. at ¶ 30.

Consol. Court No. 1:22-cv-01192                                      Page 8

The Level 3 grievance hearing occurred on December 2, 2020, and GT denied Zimmerman's grievance on December 7, 2020. Id. at ¶¶ 31–32. Under the terms of the Collective Bargaining Agreement, if a grievance is denied by the Employer at Level 3, Local 1694-1 "may request arbitration [. . .] not later than 15 calendar days after the rendering of such decision." Id. at ¶ 33. Local 1694-1 invoked the arbitration clause on December 15, 2020, and, on March 4, 2021, arbitration was scheduled for May 17, 2021. Id. at ¶ 34. On December 22, 2020, someone at GT directed Jerry Custis ("Custis"), the head of security at the Port, to summon the Wilmington Police Department to report the alleged theft of gasoline on November 10, 2020. Id. at ¶ 35. Patrolman Coffiey was the responding officer for the Wilmington Police Department and Custis showed Officer Coffiey the video of the incident and fuel records. Id. at ¶¶ 36–37. Officer Coffiey submitted an affidavit of probable cause seeking Plaintiff's arrest for theft under $1,500 and third-degree conspiracy. Id. at ¶ 38.

On January 5, 2021, Plaintiff turned himself in to the police and the Justice of the Peace Court issued a "no contact" order barring Plaintiff from the Port. Id. at ¶¶ 39–40. Plaintiff and Miller were the only Port employees to be arrested for alleged theft of property at the Port. Id. at ¶ 44. On February 1, 2021, the Court of Common Pleas rescinded the no contact order, but GT Wilmington maintained its ban prohibiting Zimmerman from entering the Port. Id. at ¶ 41. A *nolle prosequi*

Consol. Court No. 1:22-cv-01192                                    Page 9

was entered on April 19, 2021, dismissing all criminal charges against Zimmerman.  Id. at ¶ 42.  GT Wilmington's employee handbook expressly states that, "[e]mployees may be disciplined for misconduct, including, but not limited to the following: … theft."  Id. at ¶ 43.  The handbook further provides that "[a]n employee may be terminated involuntarily for reasons that include but are not limited to poor performance, misconduct, or violation of GT Wilmington's policies."  Id.

On March 11, 2021, Local 1694-1 was dissolved and, together with Plaintiff's membership, was merged into International Longshoreman's Association, Local 1694[5] ("Local 1694" or "the Union").  Id. at ¶ 45.  The Terms of the Merger directed by the ILA provide, in relevant part:

> As of the effective date of the merger, Local 1694, Local 1883, and Local 1884 shall assume all collective bargaining duties and responsibilities for all bargaining units represented by Local 1694-1 prior to the Merger, honoring the terms of any existing and extant collective bargaining agreement covering such units and assuming all representational obligations imposed by applicable law.

Merger Agreement at ¶ 12.

---

[5] In September 2022, International Longshoreman's Association, Local 2076 assumed the collective bargaining duties and responsibilities for the transferred members of International Longshoreman's Association, Local 1694.  Pl.'s Mem. Supp. Mot. (D.I. 95).  The Court granted Plaintiff's Motion to Join Defendants' Successors as Required Parties Under Fed. R. Civ. P. 19(a)(1)(A) joining International Longshoreman's Association, Local 2076 as a required party.  See Order (Dec. 17, 2025) (D.I. 97).

Consol. Court No. 1:22-cv-01192                                    Page 10

On or around March 15, 2021, the Union's Executive Board voted via text message not to pursue Plaintiff's grievance to arbitration.  Id. at ¶ 47.  Local 1694-1 had also submitted to arbitration Miller's termination grievance involving the same incident for which Plaintiff was terminated, and the Union also voted not to pursue his grievance to arbitration.  Id. at ¶ 48.  On April 28, 2021, Plaintiff requested the American Arbitration Association to proceed without representation by the Union, and Local 1694 responded that Plaintiff lacked authority to pursue the grievance independently.  Id. at ¶ 49.  Plaintiff filed a duty of fair representation claim with the National Labor Relations Board on April 28, 2021, and the National Labor Relations Board dismissed the claim on August 13, 2021, finding no arbitrary, discriminatory, or bad faith conduct.  Id. at ¶ 50.  On August 28, 2021, Plaintiff appealed the decision of Region 4, and on September 21, 2021, the National Labor Relations Board's Office of Appeals denied Plaintiff's appeal and found that Local 1694 did not breach its duty of fair representation.  Id. at ¶ 51.

At a general membership meeting of Local 1694 on August 24, 2021, Plaintiff requested that the membership vote on whether to take his grievance to arbitration.  Id. at ¶ 52.  William Ashe ("Ashe"), the Union President, ruled Plaintiff's request out of order and did not permit a membership vote.  Id. at ¶ 53.  Ashe did not explain at the meeting why a membership vote could not be permitted as to whether Plaintiff could proceed to arbitration.  Id. at ¶ 54.  At the August 24,

2021, Local 1694 general membership meeting, Ashe instructed Plaintiff to ask the Executive Board to reconsider its no arbitration decision after his motion for a membership vote on arbitration failed procedurally. Id. at ¶ 55. Ashe denied Plaintiff's August 30, 2021 request for reconsideration on September 1, 2021. Id. at ¶ 56.

Diamond State subcontracted the stevedoring work at the Port to different companies, as the stevedoring and warehouse labor at the Port is supplied by individuals who are hired daily. Id. at ¶¶ 57–58. At least one stevedoring contractor, Delaware River Stevedores, continued operating at the Port during the periods relevant to this case. Id. at ¶ 59. On March 13, 2022, Plaintiff entered the Port and began working on a ship being discharged by Delaware River Stevedores, and Plaintiff was subsequently escorted off the Port four hours later by Port Security based upon GT Wilmington's purported ban on his entry to the Port. Id. at ¶ 60.

After Plaintiff was terminated by GT, Plaintiff paid $10 in dues to Local 1694-1 in 2021, and, following the March 11, 2021 merger, Plaintiff's dues were forwarded to Local 1694. Id. at ¶ 61. Local 1694 twice rejected Plaintiff's proffers of dues in March 2022, on the grounds that they could not accept dues from a member who could not secure covered employment at the Port because of

Consol. Court No. 1:22-cv-01192 Page 12

GT's permanent ban.  Id. at ¶ 62.  On March 28, 2022, the Union sent a letter to

Plaintiff, which stated that he was no longer a member.  Id. at ¶ 63.

The Atlantic Coast District (the "District") is an intermediary body between

the ILA Local Unions on the east coast and the ILA, which is empowered by the

ILA to "do all things necessary and desirable to carry out the objects and purposes

of the ILA within its territory."  Id. at ¶ 64.  On April 18 and May 12, 2022,

Plaintiff filed charges against Ashe, Kevin Cooper Sr., and Ronald Farrell with the

District Counsel of Philadelphia/Wilmington and Atlantic Coast District.  Id.

at ¶ 65.  Included in those charges, Plaintiff alleged that Ashe failed to call a vote

on the arbitration withdrawal, denied Plaintiff's right to make a motion at the

August 24, 2021 general meeting, and refused to accept Plaintiff's dues payments.

Id.

In a decision issued on August 11, 2022, the Atlantic Coast District denied

Plaintiff's charges.  Id.  The Atlantic Coast District determined that employment

within the jurisdiction of a local union is a requirement for membership in all ILA

affiliated local unions.  Id. at ¶ 66.  The Atlantic Coast District concluded that

Plaintiff was not a member of the Union.  Id.  Following his termination at the

Port, Plaintiff worked at the Port of Philadelphia from late 2021 to 2022.  Id.

at ¶ 67.  Concurrent with his National Labor Relations Board proceedings, Plaintiff

pursued discrimination claims through the Delaware Department of Labor, filing

charges of race, age, and retaliation discrimination against GT Wilmington in October and November 2021.  Id. at ¶ 68.  The Delaware Department of Labor's preliminary findings, issued May 27, 2022, recommended dismissal on grounds that the complained of conduct fell outside of statutory anti-discrimination protections.  Id. at ¶ 69.  The Delaware Department of Labor issued a final determination of no reasonable cause on June 27, 2022.  Id.  The Equal Employment Opportunity Commission subsequently adopted this determination on November 23, 2022.  Id.  Plaintiff initiated a second administrative action with the Delaware Department of Labor on May 18, 2022, filing race and color discrimination charges against Local 1694.  Id. at ¶ 70.  The Delaware Department of Labor issued a no reasonable cause decision, which was adopted by the Equal Employment Opportunity Commission on June 7, 2023.  Id.

**LEGAL STANDARD**

The Court has jurisdiction over the underlying action pursuant to 28 U.S.C. § 1367 and 29 U.S.C. §§ 185(a) and 412.

**I.       Summary Judgment**

Summary judgment is appropriate when a party demonstrates that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is a fact that may affect the outcome of the case.  Anderson v. Liberty

Consol. Court No. 1:22-cv-01192                                                  Page 14

Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists

"if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  Id.  Material facts are those "that could affect the outcome" of

the proceeding.  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011).  "[A]

dispute about a material fact is genuine if the evidence is sufficient to permit a

reasonable jury to return a verdict for the non-moving party."  Id. (internal

quotation marks omitted).  The evidence and reasonable inference drawn from the

underlying facts must be viewed in the light most favorable to the nonmoving

party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).

        The "moving party bears the burden of proving that no genuine issue of

material fact is in dispute."  Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d

737, 743 (3d Cir. 1996).  In evaluating whether the moving party has met this

burden, the Court must view the evidence in the light most favorable to the

nonmoving party and the Court must not make credibility findings.  Anderson, 477

U.S. at 255.

        If the moving party satisfies this initial burden, the nonmoving party must

identify facts sufficient to show a genuine issue for trial to defeat the motion for

summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The

nonmoving party must go beyond the assertions and allegations of the pleadings

Consol. Court No. 1:22-cv-01192                                    Page 15

and show through affidavits, depositions, answers to interrogatories, or admissions

on file that a genuine dispute of material fact exists.  Id. at 324.

The Court must grant summary judgment if the nonmoving party "fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial."  Id. at

322.

## DISCUSSION

### I.     Motions for Summary Judgment and Partial Summary Judgment

### A.     Counts I, VII, and VIII: Wrongful Expulsion from Union Membership in Violation of LMRDA §§ 411(a)(5) and 529 and Violation of Bylaws

Count I alleges that Local 1694 violated Section 101(a)(5) of the LMRDA,

29 U.S.C. § 411(a)(5), when Local 1694 wrongfully rejected Plaintiff's tender of

dues.  Second Am. Compl. at ¶¶ 34–37.  Count VII alleges wrongful expulsion

from union membership in violation of Section 608 of the LMRDA, 29

U.S.C. § 529, when Local 1694 refused to accept Plaintiff's dues and ended his

membership status in order to prevent Plaintiff from running for union office in the

May 2022 elections.  Id. at ¶¶ 60–64.  Count VIII alleges that Local 1694 violated

its bylaws ("By-Laws") by depriving Plaintiff of membership status without

providing him the procedural due process required by Local 1694's By-Laws and

the ILA Constitution.  Id. at ¶¶ 65–69.

Consol. Court No. 1:22-cv-01192                                        Page 16

Defendants move for summary judgment as to Counts I, VII, and VIII, on the grounds that Plaintiff's loss of membership was not "discipline" within the meaning of the LMRDA, that Local 1694 did not violate the LMRDA because employment in the jurisdiction of Local 1694 is an essential term and condition of membership, and because Plaintiff received due process. Defs.' Br. at 21–28. Plaintiff contends that a wrongful expulsion claim under Section 101(a)(5) includes "discipline" of a member, whether by expulsion or otherwise. Pl.'s Resp. Br. at 10. Plaintiff argues that he was expelled without the requisite prior notice or opportunity to defend. Id. at 13.

Plaintiff moves for summary judgment as to Counts I and VIII on the grounds that Local 1694 failed to ascertain whether Plaintiff's firing by GT and subsequent ban were justified and that Plaintiff was deprived of membership status without due process. Pl.'s Br. at 9–13. Defendants contend that continued employment is a condition of continued membership. Defs.' Resp. Br. at 8–14.

29 U.S.C. § 411 states that:

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).

Consol. Court No. 1:22-cv-01192                                    Page 17

"Otherwise disciplined" is defined narrowly to encompass "only punishment authorized by the union as a collective entity to enforce its rules," and not any "act [] that deter[s] the exercise of rights protected under the LMRDA." Bullock v. Dressel, 435 F.3d 294, 297 (3d Cir. 2006) (quoting Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 91 (1989)). "Otherwise disciplined" in Section 101(a)(5) has been held to be identical to the meaning of the same phrase in Section 609. See Bullock, 435 F.3d at 297 n.1; see also Breininger, 493 U.S. at 90 n.13 ("The phrase 'otherwise disciplin[e]' appears in both §§ 101(a)(5) and 609, and we have already determined that it has the same meaning in both sections."); Finnegan v. Leu, 456 U.S. 431, 438 n.9 (1982). Discipline under Sections 101(a)(5) and 609 must be "undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership." Breininger, 493 U.S. at 91 (citations omitted). In reviewing cases of union discipline, courts "must avoid overzealous intervention in the internal affairs of unions . . . being careful not to subject the union's interpretation of its own industrial jurisprudence" to the courts', while recognizing that "judicial timidity or indifference can leave those who seek to exercise their rights helplessly vulnerable." Lewis v. Am. Fed'n of State Cnty. & Mun. Emp., AFL-CIO, 407 F.2d 1185, 1192 (3d Cir. 1969).

Consol. Court No. 1:22-cv-01192                                      Page 18

### 1.    Defendants' Interpretations

Article XIV of the ILA Constitution covers "Membership."  ILA

Constitution, Art. XIV.  Article XIV of the ILA Constitution states, in relevant

part:

> Section 1. Member in good standing when used in this Constitution includes any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership in accordance with the provisions of this Constitution and the applicable local by-laws.
>
> Section 2. Except as hereinafter provided, any worker who is employed or seeks employment in a trade, industry or occupation within the jurisdiction of the I.L.A. shall be eligible to apply for membership and shall be admitted to membership without regard to race, age, sex, citizenship, or ethnic origin thirty (30) days after application unless just cause can be shown for rejection of the application.  Locals are permitted to establish additional requirements for membership so long as these requests comply with applicable law.

ILA Constitution, Art. XIV §§ 1–2 (D.I. 107-1).  Article XVIII of the ILA

Constitution covers "Discipline."  ILA Constitution, Art. XVIII.  Article XVIII of

the ILA Constitution states that the term "discipline" shall include "a fine, removal

from office or job, disqualification to run for office, or suspension or expulsion

from membership, or suspension or cancellation of Charter."  Id. at § 1(a).  Section

1(b) of Article XVIII provides a requirement for notice and opportunity for a

hearing upon charges prior to disciplinary action of a member.  Id. at § 1(b) ("Any

Consol. Court No. 1:22-cv-01192                                    Page 19

member . . . of the I.L.A. or any of its subdivisions, shall be subject to discipline who is found guilty, after notice of and opportunity for hearing upon charges[.]").

Defendants contend that the above provisions of the ILA Constitution support the position that there are certain requirements that must be met to remain a member of Local 1694.  Defs.' Br. at 24.  Defendants concede that neither the ILA Constitution nor Local 1694's By-Laws enumerate these specific requirements, but "the requirement that an individual must be able to work in the jurisdiction of the Union is easily inferred from the Union's governing documents."  Id. (citing ILA Constitution Arts. IV, XIV; Local 1694's By-Laws Arts. II, IV).  Plaintiff argues that Defendants have taken a provision in their governing documents that governs acquisition of membership in the first instance and "imported [their] eligibility requirements into the very different provisions governing loss of membership."  Pl.'s Resp. Br. at 12 (emphasis omitted).

The articles cited by Defendants as authority to infer the requirement that an individual must be able to work in the jurisdiction pertain to (1) "Object and Purposes" of Article IV of the ILA Constitution and Article II of Local 1694's By-Laws; and (2) "Membership" of Article XIV of the ILA Constitution and Article IV of Local 1694's By-Laws.  Defendants argue that permitting an individual who could not work within the Union's jurisdiction to maintain membership in the

Consol. Court No. 1:22-cv-01192                                                        Page 20

Union would "undermine the purpose of the Union set for in its By-Laws[.]"

Defs.' Br. at 24 (citing Local 1694's By-Laws, Art. II).

> Article IV of Local 1694's By-Laws, which governs "Membership," states:
>
> (a) Except as hereinafter provided, any worker who is employed or seeks employment in a craft or trade within the jurisdiction of this local shall be eligible to apply for membership and shall be admitted to membership without regard to race, age, sex, citizenship, or ethnic origin thirty (30) days after application unless just cause can be shown for rejection of the application.
>
> (b) A member shall lose his or her good standing in the Local by suspension or expulsion from membership either for failure to pay dues and assessments or after appropriate proceedings consistent with the International Constitution.

Local 1694 By-Laws, Art. IV (D.I. 107-1).  The Atlantic Coast District of the ILA interpreted the ILA Constitution, which is binding on Local 1694 and its By-Laws, to require employment as an essential term of membership in any of its local unions.  Atlantic Coast District Report and Recommendation at 7; see ILA Constitution Art. XII § 5.

The undisputed facts establish that GT maintained its ban prohibiting Plaintiff from entering the Port.  Statement Undisputed Facts at ¶ 41.  Local 1694 rejected Plaintiff's dues because the union could not accept dues from a member who could not secure covered employment at the Port due to GT's ban.  Id. at ¶ 62. On March 28, 2022, Local 1694 sent a letter to Plaintiff stating that he was no longer a member.  Id. at ¶ 63.

Consol. Court No. 1:22-cv-01192                                        Page 21

Plaintiff argues that Local 1694 "[failed] to ascertain whether the firing and ban were justified[.]"  Pl.'s Br. at 10–11.  Defendants contend that Local 1694 "conducted an investigation into GT's termination and ban from the Port[.]"  Defs.' Resp. Br. at 12–13.  Defendants aver that Plaintiff wrongfully insists that Local 1694 was required to review documents as part of an investigation, and that Ashe's review of video footage was sufficient.  Id. at 13.  During his deposition, Ashe testified that he was not personally involved in the review of Plaintiff's grievance and that he was unsure whether other members of the Executive Board had received the documents related to the reviewing process.  Pl.'s Br., Ex. N, Ashe Dep. at 93:6–94:4 (D.I. 111-3).

It is apparent to the Court that there exists a genuine issue of material fact as to whether Local 1694 independently reviewed and considered GT's determination to terminate Plaintiff.  In addition, because the material fact of whether Plaintiff was wrongfully terminated by GT remains in dispute, particularly viewing the facts in the light most favorable to Plaintiff as the non-movant, the Court concludes that a reasonable jury could find that Plaintiff was wrongfully expelled from Local 1694.  Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Counts I and VII, and denies Plaintiff's Motion for Partial Summary Judgment as to Count I.

Consol. Court No. 1:22-cv-01192                                           Page 22

### 2.    Due Process

29 U.S.C. § 411 states that:

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

29 U.S.C. § 411(a)(5).  It is undisputed that Plaintiff received a letter stating the reasons for his loss of membership.  Statement Undisputed Facts at ¶ 63; see Letter to Zimmerman (Mar. 28, 2022) (D.I. 111-2).  The undisputed facts establish that on April 18, 2022, and May 12, 2022, Plaintiff filed charges with the District Counsel of Philadelphia/Wilmington, alleging that Ashe failed to call a vote on the arbitration withdrawal, denied Plaintiff's right to make a motion at the August 24, 2021 general meeting, and refused Plaintiff's dues payments.  Statement Undisputed Facts at ¶ 65.  The Atlantic Coast District determined that employment within the jurisdiction of a local union was required for membership in all ILA-affiliated local unions and concluded that Plaintiff was not a member of Local 1694.  Id. at ¶ 66.

The Atlantic Coast District Report and Recommendation states that "[a]ll parties were properly noticed and afforded a full and fair opportunity to present evidence and testimony and cross-examine witnesses concerning the issues before the Committee."  Atlantic Coast District Report and Recommendation at 1.

Consol. Court No. 1:22-cv-01192                                    Page 23

Plaintiff contends that Local 1694 cancelled Plaintiff's membership on March 28, 2022, without "reasonably ascertaining" whether Plaintiff was fired, and permanently banned, for "just cause."  Pl.'s Resp. Br. at 13.  Plaintiff argues that the June 28, 2022 hearing focused on the issues of Plaintiff's expulsion and his right to a membership vote on arbitration, and "did not provide a forum in which [Plaintiff] could challenge the legitimacy of GT's underlying employment decisions," which Plaintiff argues were blindly accepted by Local 1694.  Id.

The Atlantic Coast District Report and Recommendation determined that Plaintiff "cannot satisfy an essential term and condition of union membership with Local 1694."  Atlantic Coast District Report and Recommendation at 8.  As indicated in the Atlantic Coast District Report and Recommendation, Plaintiff addressed the reasons why he was terminated from GT, including: (1) the theft of fuel oil; (2) his arrest and the criminal charges filed against him regarding the theft of fuel oil; (3) the no contact order filed against him by the State of Delaware; (4) his unfair labor practice charges filed against Local 1694 stemming from his termination for theft; (5) the subsequent appeal from the National Labor Relations Board's decision; and (6) the nature of his current employment through Local 1291 in the Port of Philadelphia.  Id. at 3.  However, the Atlantic Coast District Report and Recommendation pertained to Local 1694's decision not to pursue arbitration

Consol. Court No. 1:22-cv-01192                                                    Page 24

on Plaintiff's behalf and did not discuss Local 1694's independent review of GT's

grounds for terminating Plaintiff.  See generally id.

As with Counts I and VII, it is apparent to the Court that there is a genuine

issue of material fact as to whether Plaintiff was provided due process to dispute

the alleged expulsion from Local 1694.  There is a dispute as to whether Plaintiff

received adequate due process as it relates to Local 1694's determination that

Plaintiff was terminated by GT for "just cause" and thus ineligible for Union

membership.  Because the material fact remains in dispute as to whether Plaintiff

was terminated for "just cause" and whether Local 1694 independently reviewed

the grounds for Plaintiff's termination, the Court concludes that a reasonable jury

could find that Plaintiff was wrongfully expelled from Local 1694 and denied due

process under Local 1694's By-Laws, particularly when viewed in the light most

favorable to Plaintiff as the non-movant.  Accordingly, the Court denies

Defendants' Motion for Summary Judgment as to Count VIII.

**B.    Counts III, IV, and V: Breach of Contract and Violation of Bylaws**

In Count III, Plaintiff claims that Local 1694 breached the Merger

Agreement in violation of Section 301 of the LMRA when Local 1694 failed to

honor commitments taken by Local 1694-1 prior to the merger, including the

commitment to take Plaintiff's grievance to arbitration.  Second Am. Compl.

at ¶¶ 43–47.  In Count V, Plaintiff alleges that Local 1694 breached its contractual

Consol. Court No. 1:22-cv-01192                                    Page 25

obligation under Local 1694's By-Laws when Local 1694 did not respond to or acknowledge Plaintiff's two requests for a membership review of the Executive Board's decision to withdraw Plaintiff's grievance from arbitration.  Id. ¶¶ 50–54.

Defendants argue that Count III of the Second Amended Complaint must fail as a matter of law because Plaintiff's state law claim is preempted, Local 1694 did not violate the Terms of the Merger, Local 1694's interpretation of the Merger Agreement was not patently unreasonable, and Plaintiff's claims are subject to judicial estoppel or are time-barred.  Defs.' Br. at 5.  Plaintiff responded that Local 1694 is not entitled to summary judgment on Count III.  Pl.'s Resp. Br. at 18–24. Plaintiff argues that Local 1694's interpretation of the Merger Agreement is not entitled to deference and that the factual issue of whether the disputed language was intended to require Local 1694 to honor Local 1694-1's decision to arbitrate Plaintiff's grievance, or represent Plaintiff "fairly," is for the jury to resolve.  Id.

Defendants move for summary judgment as to Count V and argue that the claim "improperly attempts to recast a dispute over grievance processing into an internal voting-rights issue that the [Collective Bargaining Agreement] does not recognize, and federal labor law does not require."  Defs.' Br. at 18–21. Defendants aver that the claim is untimely and Local 1694 did not breach any obligation imposed by Local 1694's By-Laws.  Id.

Consol. Court No. 1:22-cv-01192                                        Page 26

Plaintiff cross-moves for summary judgment as to Count V, and argues that

Local 1694 violated Article VII(b) of Local 1694's By-Laws by denying Plaintiff

his unconditional right of appeal, Pl.'s Br. at 14, and responded that "Local 1694

does not indicate when the statute of limitations began to run[,]" arguing that the

statute of limitations did not begin to run until August 11, 2022, when the Atlantic

Coast District denied Plaintiff's appeal.  Pl.'s Resp. Br. at 15–16.  Plaintiff

contends that the Complaint was timely filed in September 2022.[6]  Id. (citing

Vadino v. A. Valey Engineers, 903 F. 2d 253, 261 (3d Cir. 1990) (six-month

statute of limitations begins to run when plaintiffs knew, or should have known,

that further appeals to the Union would be futile).

### 1.    Count III: Breach of Contract Under LMRA § 301

To establish a breach of contract, a plaintiff must prove by a preponderance

of the evidence: (i) the existence of the contract; (ii) breach of an obligation

imposed by that contract; and (iii) resultant damage to the plaintiff.  Air Prods. &

Chems., Inc. v. Wiesemann, 237 F. Supp. 3d 192, 213 (D. Del. 2017) (quoting

VLIW Tech., LLC v. Hewlett–Packard Co., 840 A.2d 606, 612 (Del. 2003)).

Section 301(a) of the LMRA permits a union member to sue a labor organization

---

[6] It is apparent that Plaintiff erroneously cited to "November, 2022" as to the date he filed his Complaint because the initial Complaint in this case was filed on September 9, 2022.  See Compl. (D.I. 1).

Consol. Court No. 1:22-cv-01192                                    Page 27

for violating its constitution or bylaws.  <u>Wooddell v. Int'l Bhd. of Elec. Workers, Local 71</u>, 502 U.S. 93, 94 (1991).

The first element that Plaintiff must prove to establish that there was a breach of contract is the existence of a contract.  The undisputed facts establish that at the time of his termination, Plaintiff was a member of Local 1694-1, which was dissolved and merged into Local 1694 on March 11, 2021.  Statement Undisputed Facts at ¶¶ 7, 45.  The Terms of the Merger provide, in relevant part:

> As of the effective date of the merger, Local 1694, Local 1883, and Local 1884 shall assume all collective bargaining duties and responsibilities for all bargaining units represented by Local 1694-1 prior to the Merger, honoring the terms of any existing and extant collective bargaining agreement covering such units and assuming all representational obligations imposed by applicable law.

Merger Agreement at ¶ 12 (D.I. 107-1).  The Merger Agreement constitutes a contract between Local 1694-1 and Local 1694, which is enforceable under Section 301 of the LMRA, 29 U.S.C. § 185(a).  There exists no genuine issue of material fact as to whether a contract existed.  Accordingly, the Court concludes that the first element of the breach of contract claim has been met.

The second element that Plaintiff must prove to establish there was a breach of contract is the breach of an obligation imposed by that contract.  The Parties dispute this second element.  Defendants argue that the Merger Agreement was not breached because neither the Collective Bargaining Agreement nor applicable law required Local 1694 to pursue grievances through arbitration.  Defs.' Br. at 8–10.

Plaintiff responded that pursuant to the Merger Agreement, Defendants were obligated to honor the collective bargaining decisions of Local 1694-1, including the decision to arbitrate Plaintiff's discharge grievance.  Pl.'s Resp. Br. at 18–24.

The undisputed facts establish that prior to the merger, Plaintiff filed a grievance through Local 1694-1 regarding his termination and Local 1694-1 invoked arbitration on December 15, 2020.  Statement Undisputed Facts at ¶¶ 29, 34.  On March 4, 2021, arbitration was scheduled for May 17, 2021.  Id. at ¶ 34.  The merger of Local 1694-1 into Local 1694 resulted in Local 1694 assuming "all collective bargaining duties and responsibilities for all bargaining units represented by Local 1694-1 prior to the Merger[.]"  Merger Agreement at ¶ 12.  The undisputed facts further establish that on or around March 15, 2021, Local 1694's Executive Board voted via text message not to pursue Plaintiff's grievance at arbitration.  Statement Undisputed Facts at ¶ 47.  At the general membership meeting of Local 1694 on August 24, 2021, Plaintiff requested that the membership vote on whether to take his grievance to arbitration.  Id. at ¶ 52.  Ashe ruled Plaintiff's request out of order and did not permit a membership vote without explaining why a membership vote could not be permitted.  Id. at ¶¶ 53–54.  At this same membership meeting, Ashe instructed Plaintiff to ask the Executive Board to reconsider its no arbitration decision after Plaintiff's motion for a membership vote on arbitration failed procedurally, and Ashe subsequently denied

Consol. Court No. 1:22-cv-01192                                    Page 29

Plaintiff's August 30, 2021 request for reconsideration on September 1, 2021.  Id.

at ¶¶ 55–56.

Defendants argue that Local 1694 is under the obligation to "not violate its

duty of fair representation, the same requirement that Local 1694-1 was subject to

prior to the merger."  Defs.' Br. at 8.  Plaintiff challenges Defendants' reading of

the Merger Agreement's language concerning the "representational" obligations of

Local 1694 and argues that Local 1694 abandoned arbitration without evaluating

the merits of Plaintiff's grievance.  Pl.'s Resp. Br. at 23–24.  The issue of whether

Defendants breached their contractual obligation to Plaintiff under the Merger

Agreement is a material fact in dispute that requires further factual inquiries at trial

to understand what actions Defendants took and whether the decision to abandon

arbitration was appropriate.  The Court concludes that genuine issues of material

fact exist as to the breach of an obligation imposed by the Merger Agreement.

The third element that Plaintiff must establish to prove there was a breach of

contract is damages.  The Parties dispute this third element.  Defendants argue that

Plaintiff had the opportunity to litigate a duty of fair representation claim before

the National Labor Relations Board based on Local 1694's decision not to pursue

Plaintiff's grievance to arbitration.  Defs.' Br. at 9.  Plaintiff responded that the

merits were never fully adjudicated.  Pl.'s Resp. Br. at 21, n.15.  The undisputed

facts establish that on March 4, 2021, arbitration was scheduled for May 17, 2021.

Consol. Court No. 1:22-cv-01192                                    Page 30

Statement Undisputed Facts at ¶ 34.  After Local 1694's Executive Board voted

not to pursue Plaintiff's grievance to arbitration, Plaintiff requested that the

American Arbitration Association proceed without representation by Local 1694.

Id. at ¶ 49.  Local 1694 stated that Plaintiff lacked authority to pursue the grievance

independently.  Id.  The terms of the Merger Agreement stated that Local 1694

would assume "all collective bargaining duties and responsibilities" for all

bargaining units represented by Local 1694-1, and the issue of whether the

decision to not honor Local 1694-1's decision to proceed to arbitration resulted in

damages to Plaintiff is a material fact in dispute.

Accordingly, the issue of whether Plaintiff suffered damages because of a

breach of an obligation owed to him is a material fact in dispute that requires

further factual inquiries at trial to understand whether Defendants violated the

Merger Agreement.

Thus, because the second and third elements are disputed and require factual

inquiries at trial, Defendants' Motion for Summary Judgment on Plaintiff's claim

of breach of contract under Section 301 of the LMRA, 29 U.S.C. § 185(a), must be

denied.  Accordingly, Defendants' Motion for Summary Judgment on Count III is

denied.

Consol. Court No. 1:22-cv-01192                                    Page 31

## 2.    Count V: Violation of By-Laws

Count V of the Second Amended Complaint alleges that Local 1694 violated its By-Laws by failing to permit a general membership vote on whether to take Plaintiff's grievance to arbitration.  Second Am. Compl. at ¶¶ 50–54.  Defendants move for summary judgment as to Count V, arguing that Plaintiff's claim "improperly attempts to recast a dispute over grievance processing into an internal voting-rights issue that the [Collective Bargaining Agreement] does not recognize, and federal labor law does not require[,]" and because Plaintiff's claim is untimely. Defs.' Br. at 18–21.  Plaintiff responded that the dispute is not over "grievance processing," nor is it over the Collective Bargaining Agreement.  Pl.'s Resp. Br. at 15.

Plaintiff cross-moves for summary judgment as to Count V on the grounds that Plaintiff has the unconditional right under the bylaws, independent of the Collective Bargaining Agreement, to membership review of the Executive Board decisions without exception.  Pl.'s Br. at 13–15.  Defendants responded that Plaintiff's argument fails to understand the difference between "the handling of grievances under a [Collective Bargaining Agreement] grievance procedure" and the handling of internal Union matters under the ILA Constitution and Local 1694's By-Laws.  Defs.' Resp. Br. at 16–19.

Consol. Court No. 1:22-cv-01192                                    Page 32

Article 8 of the Collective Bargaining Agreement covers "Grievance and

Arbitration Procedure."  Collective Bargaining Agreement, Art. 8.  The collective

bargaining agreement provides that:

> If, after a thorough discussion with the Director of operations, the
> grievance has not been satisfactorily resolved, the Union Steward, the
> aggrieved employee, and the Union Business Agent, after written
> appeal, shall discuss the grievance with the Port Director within 5
> working days after the Department Head's response is due.  The Port
> Director shall respond in writing within 5 working days.

Collective Bargaining Agreement, Art. 8.4.  Under the terms of the Collective

Bargaining Agreement, if a grievance is denied by the Employer at Level 3, the

Union "may request arbitration . . . not later than 15 calendar days after the

rendering of such decision."  Id. at Art. 8.5.

The undisputed facts establish that prior to the merger, Plaintiff filed a

grievance through Local 1694-1 regarding his termination and Local 1694-1

invoked arbitration on December 15, 2020.  Statement Undisputed Facts at ¶¶ 29,

34.  On March 4, 2021, arbitration was scheduled for May 17, 2021.  Id. at ¶ 34.

The undisputed facts further establish that on or around March 15, 2021, Local

1694's Executive Board voted via text message not to pursue Plaintiff's grievance

to arbitration.  Id. at ¶ 47.  At the general membership meeting of Local 1694 on

August 24, 2021, Plaintiff requested that the membership vote on whether to take

his grievance to arbitration.  Id. at ¶ 52.  Ashe ruled Plaintiff's request out of order,

did not permit a membership vote, and did not explain why a membership vote

Consol. Court No. 1:22-cv-01192                                      Page 33

could not be permitted regarding whether Plaintiff could proceed to arbitration.  Id. at ¶¶ 53–54.  At this same membership meeting, Ashe instructed Plaintiff to ask the Executive Board to reconsider its no arbitration decision after Plaintiff's motion for a membership vote on arbitration failed procedurally, and Ashe subsequently denied Plaintiff's August 30, 2021 request for reconsideration on September 1, 2021.  Id. at ¶¶ 55–56.

Article VII(b) of Local 1694's By-Laws provides that "[a]ll decisions and actions of the Executive Board may, at the request of the membership, be submitted to a vote of the membership for review at the next meeting."  Local 1694 By-Laws, Art. VII(b).  However, the United States Supreme Court has drawn a distinction between grievance and arbitration procedures in collective bargaining agreements and internal union appeals procedures:

> In contrast to contractual grievance and arbitration procedures, which are negotiated by the parties to a collective-bargaining agreement and are generally designed to provide an exclusive method for resolving disputes arising under that agreement, internal union appeals procedures are created by the union constitution and are designed to settle disputes between an employee and his union that arise under that constitution.

Clayton v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am., 451 U.S. 679, 695–96 (1981).  It is apparent to the Court that, although Article VII(b) of Local 1694's By-Laws state that "all" decisions of the Executive Board "may" be submitted to a vote of the membership, the alleged appeals

process denied to Plaintiff does not extend to the Grievance and Arbitration Procedure outlined in the Collective Bargaining Agreement.  See Collective Bargaining Agreement, Art. 8; see also Clayton, 451 U.S. at 695–96.  Further, a close reading of Article 8.5 of the Collective Bargaining Agreement shows that the Executive Board is afforded discretion in whether to pursue arbitration on behalf of a member, as the Union "may request arbitration[.]"  Collective Bargaining Agreement, Art. 8.5.  Similarly, Article VII(b) of Local 1694's By-Laws grants the Executive Board discretion as to whether a decision or action "may . . . be submitted to a vote of the membership for review at the next meeting."  Local 1694 By-Laws, Art. VII(b).

Although the undisputed facts establish that Local 1694 "assume[d] all collective bargaining duties and responsibilities[,]" as well as "all representational obligations imposed by applicable law[,]" Local 1694 did not violate its By-Laws by denying a general membership vote on whether to take Plaintiff's grievance to arbitration.  See Merger Agreement; Statement Undisputed Facts at ¶¶ 47, 52–56.

Accordingly, because there exists no genuine issue of material fact as to whether Defendants violated Local 1694's By-Laws by denying a general membership vote on whether to procced to arbitration with Plaintiff's grievance, the Court grants Defendants' Motion for Summary Judgment as to Count V, and denies Plaintiff's Motion for Summary Judgment as to Count V.

Consol. Court No. 1:22-cv-01192                                Page 35

> **C.      Counts II and VI: Tortious Interference with Prospective Economic Advantage and Wrongful Denial of Free Speech Rights in Violation of LMRDA § 411(a)(2)**

In Count II, Plaintiff alleged that as a result of the alleged wrongful expulsion from Local 1694, Local 1694 severely impugned Plaintiff's professional reputation and standing, and intentionally interfered with Plaintiff's prospective economic advantage without legal justification or privilege. Second Am. Compl. at ¶¶ 38–42. Defendants move for summary judgment as to Count II, arguing that Section 301 of the LMRA preempts state law claims that substantially depend on the analysis of the Collective Bargaining Agreement, and that Plaintiff cannot establish the elements of tortious interference. Defs.' Br. at 4, 32–34.

Plaintiff responded that disputed material facts exist regarding Count II and that Defendants offer reasons presented to, and rejected by, the Court at the motion to dismiss stage. Pl.'s Resp. Br. at 16. Plaintiff contends that Defendants "[do] not identify, and cannot identify, which terms would have to be examined in order to determine the 'reasonable probability' of foregone business opportunities." Id. at 17 (emphasis omitted). Defendants replied with their explanation of which terms of the Collective Bargaining Agreement would have to be examined. Defs.' Reply Br. at 15.

Count VI alleges a violation of Plaintiff's free speech rights in violation of 29 U.S.C. § 411(a)(2) and 29 U.S.C. § 529. Second Am. Compl. at ¶¶ 55–59.

Defendants move for summary judgment as to Count VI, arguing that Plaintiff failed to allege that he was engaged in any activity protected by the LMRA and failed to allege that Local 1694 took any adverse action against him. Defs.' Br. at 34–36. Plaintiff responded that he engaged in protected activities by running for union office in 2021 and 2022, and that these protected activities triggered retaliatory adverse actions by Local 1694. Pl.'s Resp. Br. at 24–26. Plaintiff alleges that the retaliatory adverse actions included Local 1694's attempts in 2021 to block Plaintiff's bid for elective office, its refusal to accept his dues in December 2021 and March 2022, and Plaintiff's expulsion on March 28, 2022. Id.

### 1.    Count II: Tortious Interference with Prospective Economic Advantage

Section 301 of the LMRA provides federal courts with jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). That section "not only provides the federal courts with jurisdiction over controversies involving collective-bargaining agreements but also authorizes the courts to fashion 'a body of federal law for the enforcement of these collective bargaining agreements.'" United Steelworkers of Am., AFL–CIO–CLC v. Rawson, 495 U.S. 362, 368 (1990) (quoting Textile Workers v. Lincoln Mills of Ala., 353 U.S. 448, 451 (1957)); see also Rutledge v. Int'l Longshoremen's Ass'n AFL-CIO, 701 Fed. App'x 156, 160 (3d Cir. 2017). Section 301(a) of the LMRA

Consol. Court No. 1:22-cv-01192                                    Page 37

also permits a union member to sue a labor organization for violating its

constitution or bylaws.  Wooddell, 502 U.S. at 94.

 "At the same time, the mere existence of a collective bargaining agreement

does not prevent an individual from bringing state law claims based on some

independent agreement or obligation."  Trans Penn Wax Corp. v. McCandless, 50

F.3d 217, 229 (3d Cir. 1995).  "[A] state-law claim may depend for its resolution

upon both the interpretation of a collective-bargaining agreement and a separate

state-law analysis that does not turn on the agreement."  Lingle v. Norge Div. of

Magic Chef, Inc., 486 U.S. 399, 413 n.12 (1988).  "In such a case, federal law

would govern the interpretation of the agreement, but the separate state-law

analysis would not be pre-empted."  Id.  "[N]ot every dispute concerning

employment, or tangentially involving a provision of a collective-bargaining

agreement, is preempted by [Section] 301 or other provisions of the federal labor

law."  Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211 (1985); see Rutledge, 701

Fed. App'x at 161.

 Defendants argue that Plaintiff's tortious interference claim is preempted

because "resolving it would require the Court to interpret the terms of the

[Collective Bargaining Agreement]."  Defs.' Br. at 32.  The Court disagrees with

Defendants that Plaintiff's tortious interference claim is preempted.  See Lingle,

486 U.S. at 413 n.12; Allis-Chalmers Corp., 471 U.S. at 211.  Plaintiff's claim for

tortious interference with a prospective economic advantage is based on the wrongful expulsion from Local 1694, which Plaintiff claims was a violation of Section 101(a)(5) of the LMRA, 29 U.S.C. § 411(a)(5).  Although Section 301 of the LMRA permits a party to sue a union for violation of its constitution and bylaws, Plaintiff's claim regarding tortious interference with prospective economic advantage is based on wrongful expulsion in violation of Section 101(a)(5) of the LMRA, not a collective bargaining agreement or union bylaws that are subject to Section 301 of the LMRA.  Plaintiff's state tort claim is not pre-empted, therefore, by Section 301 of the LMRA.

In Delaware, to establish a claim for tortious interference with a prospective contractual relationship, a plaintiff must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference that induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted.  Enzo Life Scis., Inc. v. Digene Corp., 295 F. Supp. 2d 424, 429 (D. Del. 2003) (citing Lucent Info. Mgmt., Inc. v. Lucent Techs. Inc., 5 F. Supp. 2d 238, 243 (D. Del. 1998)).  The conduct underlying a claim for tortious interference with prospective economic advantage must be wrongful.  See KT4 Partners, LLC v. Palantir Techs., Inc., 2018 WL 4033767, at *6 (Del. Super. Ct. Aug. 22, 2018) ("[A] plaintiff must also allege that

Consol. Court No. 1:22-cv-01192                                            Page 39

the conduct was 'wrongful' to support a claim for tortious interference with

prospective economic advantage . . .[.]'").  In determining whether conduct was

wrongful, Delaware courts consider the factors in the Restatement (Second) of

Torts:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the
> interests of the other with which the actor's conduct interferes, (d) the
> interests sought to be advanced by the actor, (e) the social interests in
> protecting the freedom of action of the actor and the contractual
> interests of the other, (f) the proximity or remoteness of the actor's
> conduct to the interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767 (1979); see also KT4 Partners, 2018 WL

4033767, at *6.

The first element of Plaintiff's claim for tortious interference with a

prospective contractual relationship is whether there existed a valid business

relationship or expectancy.  Defendants maintain that examining the first element

requires an application of the Collective Bargaining Agreement because Plaintiff's

employment at the Port was entirely controlled by the terms of the Collective

Bargaining Agreement and is thus preempted.  Defs.' Br. at 33.  As stated

previously, the Court does not view Plaintiff's claim as preempted by Section 301.

See Lingle, 486 U.S. at 413 n.12; Allis-Chalmers, 471 U.S. at 211.  Plaintiff argues

that, as a "very experienced equipment operator with nearly 35 years of seniority,"

he would have a guaranteed steady flow of work from the Port.  Pl.'s Resp. Br. at

17–18.  Accordingly, based on the record, the Court concludes that a reasonable

jury could find that there was a valid business relationship or expectancy.

Therefore, the first element is disputed, and a genuine issue of material fact exists.

The second element of Plaintiff's claim for tortious interference with a

prospective contractual relationship is whether there was knowledge of the

relationship or expectancy on the part of the interferer.  Defendants do not present

any argument as to why Plaintiff does not meet the second element of the claim for

tortious interference with a prospective contractual relationship.  Defendants argue

that the Court would "first have to examine the just cause provision of the

[Collective Bargaining Agreement] to determine if [Plaintiff] was discharged for

just cause."  Defs.' Reply Br. at 15.  Defendants contend that the Court would then

have to examine the seniority provisions and hiring provisions to determine the

nature of Plaintiff's "protected rights."  Id.  As noted above, Plaintiff maintains

that he would have a guaranteed steady flow of work from the Port as an

experienced equipment operator.  Pl.'s Resp. Br. at 17–18.  Accordingly, the Court

concludes that a reasonable jury could find that Local 1694 had knowledge of

Plaintiff's valid business relationship or expectancy.  Therefore, the second

element is disputed, and a genuine issue of material fact exists.

The third element of Plaintiff's claim for tortious interference with a

prospective contractual relationship is whether there was an intentional

interference that induced or caused a breach or termination of the relationship or

expectancy.  The Parties dispute whether Local 1694 denied Plaintiff's union membership and thus interfered with any business opportunity.  See Defs.' Br. at 33 (claiming Local 1694 did not interfere with Plaintiff's business opportunity by denying Plaintiff membership); Pl.'s Resp. Br. at 18 (claiming that Local 1694 was complicit in the "derailing of" Plaintiff's career).  The undisputed facts establish that many of the workers at the Port are members of various unions with jurisdiction at the Port, but union membership is not a requirement of employment at the Port.  Statement Undisputed Facts at ¶ 6.  It is undisputed that GT maintained its ban prohibiting Plaintiff from entering the Port.  Id. at ¶ 41.  It is undisputed that Local 1694 "twice rejected [Plaintiff's] proffers of dues in March 2022, on the ground that they could not accept dues from a member who, because of GT's permanent ban, could not secure covered employment at the Port."  Id. at 62.  Plaintiff argues that Local 1694 did nothing to challenge the ban, did not determine whether the ban was still in effect at the time that they expelled Plaintiff because of the ban, and prevented Plaintiff from reestablishing his career at the Port.  Pl.'s Resp. Br. at 18.

Based on the record, the Court concludes that a reasonable jury could find that Local 1694 intentionally interfered with Plaintiff's ability to gain employment at the Port.  Therefore, the third element is disputed, and a genuine issue of material fact exists.

Consol. Court No. 1:22-cv-01192                                           Page 42

The fourth element of Plaintiff's claim for tortious interference with a prospective contractual relationship is whether there were resulting damages to the party whose relationship or expectancy was disrupted. It is undisputed that GT maintained its ban prohibiting Plaintiff from entering the Port. Statement Undisputed Facts at ¶ 41. The undisputed facts establish that Local 1694 rejected Plaintiff's dues on the ground that Local 1694 could not accept dues from a member who, "because of GT's permanent ban, could not secure covered employment at the Port." Id. at ¶ 62. The Court concludes that there are genuine issues of material fact as to the amount of damages that Plaintiff suffered as a result of his valid business relationship or expectancy being disrupted.

Thus, because the first, second, third, and fourth elements are disputed and require factual inquiries at trial, Defendants' Motion for Summary Judgment on Plaintiff's claim of tortious interference with prospective economic advantage must be denied. Accordingly, Defendants' Motion for Summary Judgment as to Count II is denied.

### 2.    Count VI: Wrongful Denial of Free Speech Rights in Violation of LMRDA § 411(a)(2)

Under 29 U.S.C. § 411(a)(2):

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject

Case 1:22-cv-01192-JCG    Document 133    Filed 03/30/26    Page 43 of 46 PageID #: 2757

Consol. Court No. 1:22-cv-01192                                          Page 43

> to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided* [t]hat nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2) (emphasis in original). The United States Court of Appeals for the Third Circuit has articulated a general rule that under the LMRA, "the members' right of free speech is given an expansive protection." Mallick v. Int'l Bhd. of Elec. Workers, 644 F.2d 228, 235 (3d Cir. 1981). "A plaintiff claiming retaliation [pursuant to Section 411(a)(2)] must establish three elements: (1) he engaged in protected expression; (2) he was subjected to an adverse action; and (3) the retaliation was a direct result of the protected expression." McCarthy v. Int'l Ass'n of Machinists & Aerospace Workers, No. 21-1673, 2021 WL 5766569, at *4 (3d Cir. Dec. 6, 2021) (emphasis omitted).

The first element is whether Plaintiff was engaged in protected expression. The Parties dispute this first element. Defendants argue that Plaintiff "fail[ed] to allege that he was engaged in any activity protected by the [LMRA]." Defs.' Br. at 34 (citing Second Am. Compl. at ¶¶ 55–59). Plaintiff contends that he engaged in protected activity when he ran for an elected seat on Local 1694's Executive Board in 2021, and again when he planned to run in the 2022 election. Pl.'s Resp. Br. at 24–25. Based on the record, the Court concludes that a reasonable jury could find

Consol. Court No. 1:22-cv-01192                                             Page 44

that Plaintiff satisfies the first element of his denial of free speech rights claim

because there exists a genuine issue of material fact as to whether Plaintiff engaged

in protected activity.

The second element is whether Plaintiff was subjected to adverse action.

The Parties dispute this second element.  Defendants argue that because the

election was held by the Department of Labor, Local 1694 could not have

prevented Plaintiff from running.  Defs.' Br. at 35.  Defendants contend that Local

1694's refusal of Plaintiff's dues was unrelated to Plaintiff running for election.

Id. at 35–36.  Plaintiff argues that "Local 1694 unsuccessfully attempted to block

[Plaintiff's] candidacy for a seat on its Executive Board in the July, 2021 union

elections[,]" and that "[o]nly through the intervention of the U.S. Department of

Labor was Zimmerman able to secure a place on the ballot."  Pl.'s Resp. Br. at 24–

25.  Plaintiff avers that Defendants refused his dues in an effort to keep him from

running for the Executive Board in the 2022 election.  Id. at 25.  Based on the

record, the Court concludes that a reasonable jury could find that Plaintiff satisfies

the second element of his denial of free speech rights claim because there exists a

genuine issue of material fact as to whether Plaintiff suffered an adverse action.

The third element is whether the retaliation Plaintiff suffered was a direct

result of Plaintiff engaging in protected expression.  The Parties dispute this third

element.  Defendants argue that Plaintiff's loss of membership was a result of his

Consol. Court No. 1:22-cv-01192                                           Page 45

inability to meet the requirements of membership.  Defs.' Br. at 35–36.  Plaintiff

contends that Plaintiff's protected activities triggered retaliatory adverse actions by

Local 1694, including: (1) the attempts in 2021 to block Plaintiff's bid for elective

office; (2) the refusal to accept his dues in December 2021 and March 2022; and

(3) Plaintiff's expulsion on March 28, 2022.  Pl.'s Resp. Br. at 25–26.  Plaintiff

argues that there exists a genuine issue of material fact as to when his membership

status was stripped.  Id. at 26; see Defs.' Br. at 23 (stating that Plaintiff loss of

membership occurred on January 1, 2022, after his prepaid dues remitted to Local

1694-1 expired, and he was no longer eligible for membership); Pl.'s Resp. Br. at

26 (stating that Plaintiff received notice of his expulsion in a letter dated March 28,

2022).  Based on the record, the Court concludes that a reasonable jury could find

that Plaintiff satisfies the third element of his denial of free speech rights claim

because there exists a genuine issue of material fact as to whether the retaliation

Plaintiff suffered was a direct result of Plaintiff engaging in protected expression.

Thus, because the first, second, and third elements are disputed and require

factual inquiries at trial, Defendants' Motion for Summary Judgment on Plaintiff's

claim of wrongful denial of free speech rights must be denied.  Accordingly,

Defendants' Motion for Summary Judgment as to Count VI is denied.

Consol. Court No. 1:22-cv-01192                                             Page 46

## CONCLUSION

Upon review and consideration of Defendants' Motion for Summary

Judgment (D.I. 106), Plaintiff's Motion for Partial Summary Judgment (D.I. 110),

and all other papers and proceedings in this action, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (D.I. 106) is

granted as to Count V, and is denied as to Counts I, II, III, VI, VII, and VIII; and it

is further

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (D.I.

110) is denied; and it is further

**ORDERED** that Count IV is dismissed.

IT IS SO ORDERED this 30th day of March, 2026.


                                            /s/ Jennifer Choe-Groves
                                            Jennifer Choe-Groves
                                            U.S. District Court Judge*

---

* Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.